# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CAITLIN DULANY, LARISSA GOMES, and MELISSA THOMPSON, individually and on behalf of all others similarly situated, | No. 1:18-cv-04857 |
| Plaintiffs, | |
| v. | JURY TRIAL DEMANDED |
| MIRAMAX FILM NY, LLC, THE WALT DISNEY COMPANY, DISNEY ENTERPRISES, INC., HARVEY WEINSTEIN, ROBERT WEINSTEIN, DIRK ZIFF, TIM SARNOFF, MARC LASRY, TARAK BEN AMMAR, LANCE MAEROV, RICHARD KOENIGSBERG, PAUL TUDOR JONES, JEFF SACKMAN, JAMES DOLAN, MIRAMAX DOES 1-10, and JOHN DOES 1-50, inclusive, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION .............................................................................................1

II.     JURISDICTION AND VENUE ......................................................................5

III.    THE PARTIES.................................................................................................6

      A.      Plaintiffs ...............................................................................................6

      B.      Defendants ............................................................................................7

      C.      Unnamed Co-Conspirator ..................................................................10

IV.     FACTS ...........................................................................................................11

      A.      Weinstein's power in the entertainment industry—from his time at both Miramax and TWC—was extensive......................................................................11

      B.      Weinstein's predatory behavior followed a pattern designed for his personal gratification at the expense of Plaintiffs and the Class. ..........................................12

      C.      Like the Class members and countless others, Plaintiffs' experiences followed the same script. ............................................................................23

            1.      Plaintiff Caitlin Dulany's experience with Weinstein, Miramax and the Weinstein Sexual Enterprise. ..............................................................23

            2.      Plaintiff Larissa Gomes' experience with Miramax and the Weinstein Sexual Enterprise. ...............................................................29

            3.      Plaintiff Melissa Thompson's experience with Weinstein, The Weinstein Company and the Weinstein Sexual Enterprise.......................................33

      D.      The Complicit Producers facilitated Weinstein's predatory behavior...................44

      E.      The Weinstein Sexual Enterprise or "Army of Spies".........................................50

            1.      The common purpose of the enterprise was to harass and mislead Class members and the media to prevent the victims from reporting Weinstein's sexual misconduct and to destroy evidence. ..............................................50

            2.      Each member of the Enterprise played a role in directing and participating in the Weinstein Sexual Enterprise. ...........................................................50

            3.      The Weinstein Sexual Enterprise engaged in a pattern of racketeering activity...................................................................................................52

F.      The statute of limitations is tolled based on the continuing violations doctrine, equitable estoppel, and the duress pursuant to which Weinstein threatened the Class if they complained. ........................................................................59

V.      CLASS ALLEGATIONS .................................................................................64

VI.     CAUSES OF ACTION .....................................................................................67

COUNT I VIOLATION OF 18 U.S.C. § 1962(C) (PLAINTIFFS VERSUS ALL RICO DEFENDANTS) ...............................................................................................67

COUNT II  VIOLATION OF 18 U.S.C. § 1962(D) BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962(C) (PLAINTIFFS  VERSUS ALL RICO DEFENDANTS) ................................72

COUNT III  NEGLIGENT SUPERVISION AND RETENTION  (CAITLIN DULANY AND LARISSA GOMES VERSUS MIRAMAX, DISNEY, DISNEY ENTERPRISES, AND ROBERT WEINSTEIN)....................................................................................73

COUNT IV  NEGLIGENT SUPERVISION AND RETENTION  (MELISSA THOMPSON VERSUS TWC'S BOARD MEMBERS) .........................................................74

COUNT V  CIVIL BATTERY (CAITLIN DULANY AND LARISSA GOMES VERSUS MIRAMAX AND WEINSTEIN) ......................................................................75

COUNT VI CIVIL BATTERY  (MELISSA THOMPSON   VERSUS TWC BOARD MEMBERS AND WEINSTEIN) ......................................................................76

COUNT VII  ASSAULT  (CAITLIN DULANY AND LARISSA GOMES VERSUS WEINSTEIN AND MIRAMAX) ......................................................................78

COUNT VIII  ASSAULT  (MELISSA THOMPSON  VERSUS WEINSTEIN AND TWC BOARD MEMBERS).....................................................................................79

COUNT IX  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (CAITLIN DULANY AND LARISSA GOMES VERSUS WEINSTEIN AND MIRAMAX) .........81

COUNT X  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (MELISSA THOMPSON VERSUS WEINSTEIN AND TWC BOARD MEMBERS).....................82

COUNT XI  NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS  (CAITLIN DULANY AND LARISSA GOMES VERSUS WEINSTEIN AND MIRAMAX) ..........................83

COUNT XII  NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS  (MELISSA THOMPSON VERSUS WEINSTEIN AND TWC BOARD MEMBERS)....................85

COUNT XIII  RATIFICATION  (CAITLIN DULANY AND LARISSA GOMES VERSUS MIRAMAX AND ROBERT WEINSTEIN) ....................................................86

COUNT XIV  RATIFICATION  (MELISSA THOMPSON VERSUS TWC'S BOARD OF DIRECTORS) ................................................................................................................. 87

PRAYER FOR RELIEF ............................................................................................................. 88

Plaintiffs Caitlin Dulany, Larissa Gomes, and Melissa Thompson, individually and on behalf of all others similarly situated, allege as follows:

## I.      INTRODUCTION

1.      The proverbial "casting couch" was Harvey Weinstein's office of choice, a choice facilitated and condoned by Miramax, The Weinstein Company ("TWC"), and its Board of Directors.  Plaintiffs, and hundreds of other females like them, found themselves with Weinstein on the casting couch at offices, in hotel rooms, in his homes, or in rooms at industry functions. Under the guise of meetings ostensibly to help further Plaintiffs' careers, or to hire them, or to make a business deal with them, or to socialize at industry events, Weinstein isolated Plaintiffs and Class members in an attempt to engage in unwanted sexual conduct that took many forms: flashing, groping, fondling, harassing, battering, false imprisonment, sexual assault, attempted rape, and/or completed rape.

2.      Plaintiffs and members of the Class had or wanted to have careers or wanted to make deals in the entertainment industry and correctly understood that Weinstein was a powerful force in the entertainment production world.  At all times, Plaintiffs and the Class operated under duress and the credible and objective threat of being threatened or blacklisted by Weinstein and major film producers such as Miramax and TWC if they refused Weinstein's unwanted sexual advances or complained about his behavior. To the extent a woman was "lucky" enough to escape physically unscathed, Weinstein's behavior (and the fact it was facilitated by TWC, TWC's Board, and Miramax (sometimes referred to as the "Complicit Producers")) nonetheless caused injury to her business prospects, career, and reputation, and caused severe emotional and physical distress.

3.      Weinstein's power and the pervasiveness of his misconduct were recently summarized in *The New Yorker* as follows:

> Since the establishment of the first studios, a century ago, there have been few movie executives as dominant, or as domineering, as Harvey Weinstein.  He co-founded the production-and-distribution companies Miramax and the Weinstein Company, helping to reinvent the model for independent films with movies including "Sex, Lies, and Videotape," "The Crying Game," "Pulp Fiction," "The English Patient," "Shakespeare in Love," and "The King's Speech."  Beyond Hollywood, he has exercised his influence as a prolific fund-raiser for Democratic Party candidates, including Barack Obama and Hillary Clinton.  Weinstein combined a keen eye for promising scripts, directors, and actors with a bullying, even threatening, style of doing business, inspiring both fear and gratitude.  His movies have earned more than three hundred Oscar nominations, and, at the annual awards ceremonies, he has been thanked more than almost anyone else in movie history, ranking just after Steven Spielberg and right before God.
>
> For more than twenty years, Weinstein, who is now sixty-five, has also been trailed by rumors of sexual harassment and assault.  His behavior has been an open secret to many in Hollywood and beyond, but previous attempts by many publications, including *The New Yorker*, to investigate and publish the story over the years fell short of the demands of journalistic evidence.  Too few people were willing to speak, much less allow a reporter to use their names, and Weinstein and his associates used nondisclosure agreements, payoffs, and legal threats to suppress their accounts.  Asia Argento, an Italian film actress and director, said that she did not speak out until now—Weinstein, she told me, forcibly performed oral sex on her—because she feared that Weinstein would "crush" her.  "I know he has crushed a lot of people before," Argento said.  "That's why this story—in my case, it's twenty years old, some of them are older—has never come out."

4.      On October 5, 2017, *The New York Times*, in a powerful report by Jodi Kantor and Megan Twohey, revealed multiple allegations of sexual harassment against Weinstein, an

- 2 -

article that led to the resignation of four members of the TWC's all-male board and to Weinstein's firing.[1]

5.      Weinstein's widespread sexual misconduct did not occur without the help of others.  Rather, over time, Weinstein enlisted the aid of the Complicit Producers, along with other firms and individuals, to facilitate and conceal his pattern of unwanted sexual conduct.  This coalition of firms and individuals became part of the growing "Weinstein Sexual Enterprise," a RICO enterprise.  The Weinstein Sexual Enterprise had many participants, grew over time as the obfuscation of Weinstein's conduct became more difficult to conceal, and included (i)  TWC, TWC's Board of Directors (including Robert Weinstein, Dirk Ziff, Tim Sarnoff, Marc Lasry, Tarak Ben Ammar, Lance Maerov, Richard Koenigsberg, and Paul Tudor Jones—collectively, the "Board"), Weinstein, and Miramax, all of whom are responsible for Weinstein's sexual offenses because Weinstein acted within the scope of his employment and/or these persons and entities ratified or concealed Weinstein's conduct or participated in the decades-long campaign to squelch complaints or to illegally procure the silence of victims, witnesses and others (collectively, the "Weinstein Participants" or "RICO Defendants");[2] (ii) third parties Kroll Associates, Inc. and Corporate Risk Holdings, LLC ("Kroll"), a global leader in corporate intelligence; B.C. Strategy U.K. Ltd. ("Black Cube"), a company composed of a "select group of veterans from the Israeli elite intelligence units that specializes in tailored

---

[1] Jodi Kantor & Megan Twohey, *Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades*, N.Y. TIMES (Oct. 5, 2017), https://www.nytimes.com/2017/10/05/us/harvey-weinstein-harassment-allegations.html.

[2] Disney and Disney Enterprises are named as employers of Weinstein for purposes of liability for negligent retention and supervision only at this juncture.

solutions to complex business and litigation challenges"[3]; Jack Palladino and Sara Ness of Palladino & Sutherland; and other investigators whose identities are currently unknown (collectively, the "Intelligence Participants"); (iii) lawyers and law firms, including but not limited to David Boies and Boies Schiller Flexner LLP; K&L Gates; BCL Burton Copeland; Gross, Klatthandler, Hodak, Halevy, Greenberg & Co.; and Brafman & Associates, P.C. (collectively, the "Law Firm Participants"); (iv) casting directors and agencies, directors, co-producers of Miramax and TWC, and other entertainment industry members (the "Film Participants"); and (v) journalists, including an unnamed freelance reporter, along with reporters from and the chief content officer (Dylan Howard) for American Media Inc., which publishes the *National Enquirer* (collectively, "Journalist Participants"). The identities of many of the members of the Weinstein Sexual Enterprise are currently unknown but discoverable through the discovery process.

6. After the initial assault(s) were over, Weinstein engaged or directed private investigators, a "global provider of risk solutions," lawyers, and others (collectively, the "Weinstein Sexual Enterprise," or, as *The New Yorker* calls them, "Weinstein's Army of Spies"[4]) to harass, threaten, extort, and mislead both Weinstein's victims and the media to prevent, hinder, and avoid the prosecution, reporting, or disclosure of his sexual misconduct. Weinstein and members of the Weinstein Sexual Enterprise also either directed or facilitated the Weinstein Sexual Enterprise's destruction, mutilation, and concealment of records, documents, and/or other evidence in an effort to prevent the use of such evidence to reveal his sexual offenses.

---

[3] *See* www.blackcube.com (last accessed Nov. 7, 2017).

[4] Ronan Farrow, *Harvey Weinstein's Army of Spies*, THE NEW YORKER (Nov. 6, 2017), https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies/.

7.     The Weinstein Sexual Enterprise's long-running practice of isolating, blacklisting, and deceiving Weinstein's victims (which occurred as recently as the summer of 2017 to Plaintiff Katherine Kendall and in October 2017 to Plaintiff Melissa Thompson) and covering up Weinstein's predatory tactics should not be permitted to overcome the interests of the Plaintiffs and the Class members to proceed collectively, with strength together, in a unified manner in this class action. Plaintiffs seek certification of a Rule 23(c)(4) class for liability for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), civil battery, assault, and intentional and negligent infliction of emotional distress, against the TWC Board members, Weinstein, and Miramax.  Plaintiffs will also seek certification of a Rule 23(c)(4) class for liability against the Disney, Disney Enterprises, Miramax, and TWC's Board members for the negligent supervision or retention of an unfit officer, director, and/or employee. Defendants' conduct has caused widespread damage, including personal injury, emotional distress, and damage to the careers of Plaintiffs and the Class, for which Defendants must be held responsible.

## II.     JURISDICTION AND VENUE

8.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, and 18 U.S.C. § 1964(c), because this action alleges violations of the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.

9.     This Court also has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action, including claims asserted on behalf of a nationwide class, filed under Rule 23 of the Federal Rules of Civil Procedure; there are dozens, and likely hundreds, of proposed Class members; the aggregate amount in controversy exceeds the jurisdictional amount or $5,000,000.00; and the Complicit Producers are citizens of a State different from that of Plaintiffs and members of the Class. This

- 5 -

Court also has subject matter jurisdiction over Plaintiffs' and the proposed Class's claims pursuant to 28 U.S.C. § 1367(a).

10.     Venue is proper in this District under 28 U.S.C. § 1391 (a)–(d) because, *inter alia*, substantial parts of the events or omissions giving rise to the claim occurred in the District and/or a substantial part of property that is the subject of the action is situated in the District.

### III.    THE PARTIES

**A.    Plaintiffs**

11.     Plaintiff Caitlin Dulany is a citizen of the United States and resident of Studio City, California. Dulany met Weinstein outside the Miramax offices in New York City in 1996. From there, she began to spend time with Weinstein, and he took steps to earn her trust as a friend and mentor. That same year, Weinstein assaulted, threatened, and falsely imprisoned Dulany in her apartment in New York City. Then several months later, Weinstein sexually assaulted, battered, threatened, and falsely imprisoned Dulany in his Miramax hotel suite at the Cannes Film Festival. As a result, Dulany suffered severe emotional and physical distress and injury to her property and livelihood.

12.     Plaintiff Larissa Gomes is a citizen of Canada and a lawful permanent resident of the United States. She resides in Los Angeles, California. Gomes met with Weinstein twice to discuss opportunities to work as an actor, singer, and dancer in Miramax films. On the second occasion, Weinstein imprisoned Gomes in his hotel room and threatened, battered, and assaulted her, causing her physical and emotional distress and injury to her property and livelihood.

13.     Plaintiff Melissa Thompson is a citizen of the United States and a resident of Stamford, Connecticut. Thompson pitched a new technology platform for use in marketing TWC films and productions. During the pitch at TWC's offices, Thompson was sexually harassed by Weinstein. Weinstein subsequently sexually assaulted Thompson, causing her severe emotional,

psychological, and physical distress and injury to her property or livelihood.  Moreover, in

October 2017, Weinstein's attorneys, Benjamin Brafman and Alex Spiro, used deceptive tactics

to cause her to believe that Brafman and Spiro were working for the victims in order to entice her

to turn over her visual and audio evidence of Weinstein's actions (which she did). She did not

learn that Brafman was actually Weinstein's attorney until after turning over the evidence in her

possession, causing her credible fear for her safety, severe emotional distress, and injury to her

business and property.

### B.    Defendants

14.    Miramax Film NY, LLC is a New York corporation with its principal place of

business in Santa Monica, California.  In 2010, Miramax Film NY, LLC merged with and

assumed all liabilities of Miramax Film Corp., which was the Miramax entity that employed

Harvey Weinstein or for which Harvey Weinstein acted as an officer or director. Miramax Film

Corp. was a subsidiary of The Walt Disney Company.

15.    The true names and capacities of the defendants named herein as Miramax Does

1-10 are unknown to Plaintiffs, who therefore sue them under these fictitious names.  Plaintiffs

will amend their complaint to add their true names and capacities when they become known.

16.    The Walt Disney Company ("Disney") is a Delaware corporation with its

principal place of business located in Burbank, California. In two of Harvey Weinstein's

employment agreements with Miramax Film Corp., effective in or about 1993-1995 and 1995-

1999, Disney is defined as a "co-obligor" of Miramax Film Corp.[5]

---

[5] *Doe v. Weinstein*, 2018 ONSC 2122 (Can. Ont. S.C.J. Mar. 19, 2018), available at
http://canlii.ca/t/hrg30.

17.     Disney Enterprises, Inc. ("Disney Enterprises") is a Delaware corporation with its principal place of business in Burbank, California. In a 1999 employment agreement between Harvey Weinstein and Miramax, "'Disney Enterprises Inc. (formerly known as The Walt Disney Company, a Delaware corporation' is defined as a 'co-obligor' of Miramax Film Corp."

18.     Defendant Harvey Weinstein is a citizen of the United States and a resident of New York, New York.  He is a former co-chairman of Miramax, and was a director and employee of TWC from 2005 to October 2017.

19.     Defendant Robert Weinstein is a citizen of the United States and a resident of Greenwich, Connecticut.  Robert Weinstein is the brother of Harvey Weinstein, the former chairman of Miramax, and has been a director of TWC since October 21, 2005. Robert Weinstein has known of Harvey Weinstein's pattern and practice of predatory sexual conduct toward women, including during the time the brothers worked at Miramax and TWC.

20.     Defendant Dirk Ziff is a citizen of the United States and a resident of New York, New York.  Dirk Ziff was a director of TWC from October 2005 to October 2017.  Ziff knew of Weinstein's pattern and practice of predatory sexual conduct toward women from both his personal relationship with Weinstein and his position as a director of TWC.

21.     Defendant Tim Sarnoff is a citizen of the United States and a resident of Westlake Village, California.  Tim Sarnoff was a director of TWC from June 2013 to October 2017. Sarnoff knew of Weinstein's pattern and practice of predatory sexual conduct toward women from both his personal relationship with Weinstein and his position as a director of TWC.

22.     Defendant Marc Lasry is a citizen of the United States and a resident of New York, New York.  Marc Lasry was a director of TWC from in or about June 2016 to October 2017. Lasry knew of Weinstein's pattern and practice of predatory sexual conduct toward

women from both his personal relationship with Weinstein and his position as a director of TWC.

23.     Defendant Tarak Ben Ammar is a citizen of Tunisia and currently resides in France.   Tarak Ben Ammar has been a director of TWC since October 21, 2005.  Ammar knew of Weinstein's pattern and practice of predatory sexual conduct toward women from his position as a director of TWC.  Ammar admitted that he and the TWC Board were aware that Weinstein had been accused of groping model Ambra Battilana Gutierrez in 2015.[6]  According to Ammar, the majority of the then-TWC Board members supported renewing Weinstein's contract despite the serious assault allegations.[7]

24.     Defendant Lance Maerov is a citizen of the United States and a resident of Bedford, New York.  Lance Maerov has been a director of TWC since March 18, 2013, and was a non-voting observer from 2005 to 2013. Maerov knew of Weinstein's pattern and practice of predatory sexual conduct toward women from his position as a director of TWC. According to Maerov, for years prior to the 2015 Gutierrez allegations, he had heard from TWC employees about complaints against Weinstein.[8]

25.     Defendant Richard Koenigsberg is a citizen of the United States and a resident of Franklin Lakes, New Jersey.  Richard Koenigsberg was a director of TWC from TWC's 2005 inception through October 2017. Koenigsberg knew of Weinstein's pattern and practice of

---

[6] Elsa Keslassy, *TWC Board Member: We Demanded Harvey Re-Sign Code of Conduct in 2015*, VARIETY (Oct. 11, 2017).

[7] Shawn Tully, *How a Handful of Billionaires Kept Their Friend Harvey Weinstein in Power*, FORTUNE (Nov. 24, 2017), http://fortune.com/2017/11/19/weinstein-scandal-board-battles/.

[8] *Id.*

predatory sexual conduct toward women from his personal relationship with Weinstein and his position as a director of TWC.

26.     Defendant Paul Tudor Jones is a citizen of the United States and a resident of Palm Beach, Florida.  Jones was a director of TWC from October 2015 to October 2017. Jones knew of Weinstein's pattern and practice of predatory sexual conduct toward women from his personal relationship with Weinstein and his position as a director of TWC.

27.     Defendant Jeff Sackman is a citizen of the United States and, on information and belief, a resident of Toronto, Canada.  Sackman was a director of TWC from September 2010 to October 2015. Sackman knew of Weinstein's pattern and practice of predatory sexual conduct toward women from his personal relationship with Weinstein and his position as a director of TWC.

28.     Defendant James L. Dolan is a citizen of the United States and a resident of Miller Place, New York. Dolan was a director of TWC from about mid-2015 to June 2016. Dolan knew of Weinstein's pattern and practice of predatory sexual conduct toward women from his personal relationship with Weinstein and his position as a director of TWC.

29.     By virtue of their positions as board members, each of the Director Defendants availed themselves of the laws of New York and are subject to jurisdiction in New York.

**C.     Unnamed Co-Conspirator**

30.     The Weinstein Company Holdings, LLC ("TWC") is a Delaware limited liability company whose principal place of business is in New York City, New York.  TWC recently filed for bankruptcy and thus is not named as a Defendant at this time.

010717-11 1031668 V3

## IV.    FACTS

**A.    Weinstein's power in the entertainment industry—from his time at both Miramax and TWC—was extensive.**

31.    In the late 1970s, using profits from their concert promotion business, brothers Harvey and Bob Weinstein created a small independent film-distribution company named Miramax, named after their parents, Miriam and Max.  The company's first releases were primarily music-oriented concert films such as Paul McCartney's *Rockshow*.  *The Secret Policeman's Other Ball*, released in May 1982, became Miramax's first hit.  The Weinsteins slowly built upon this success throughout the 1980s with films that achieved both critical attention and modest commercial success.  Harvey Weinstein and Miramax gained wider attention in 1988 with the release of Errol Morris' documentary *The Thin Blue Line*, which detailed the struggle of Randall Adams, a wrongfully convicted Death Row inmate.  The publicity that soon surrounded the case resulted in Adams' release and nationwide publicity for Miramax.  In 1989, Steven Soderbergh's *Sex, Lies, and Videotape* propelled Miramax to become the most successful independent studio in America.

32.    Miramax continued to grow its library of films and directors. In 1993, after the success of *The Crying Game*, Disney offered to purchase Miramax from the Weinsteins for $80 million.  The Weinstein brothers agreed to the deal, which promised to cement their Hollywood clout and ensure that they would remain at the head of their company. The next year, Miramax released its first blockbuster, Quentin Tarantino's *Pulp Fiction*, and distributed the popular independent film *Clerks*.

33.    Miramax won its first Academy Award for Best Picture in 1997 with the victory of *The English Patient* (*Pulp Fiction* was nominated in 1995 but lost to *Forrest Gump*).  This

was the first in a series of critical successes that included *Good Will Hunting* (1997) and *Shakespeare in Love* (1998), both of which won numerous Academy Awards.

34.     The Weinstein brothers left Miramax on September 30, 2005, to form their own production company, TWC, with several other media executives.  Attached as Exhibit A is a list of Weinstein-produced films that demonstrates Weinstein's power and influence in the film industry.

35.     Plaintiffs and the Class were aware of Weinstein's ability to make or break their careers, as well as to continue to inflict emotional distress.  Moreover, Weinstein wielded and was outspoken about his power and ability to either launch their careers or ruin their personal and professional reputations forever.

**B.      Weinstein's predatory behavior followed a pattern designed for his personal gratification at the expense of Plaintiffs and the Class.**

36.     Wielding unfettered power in the movie and television industry, Weinstein has admitted that his predatory and sexually harassing behavior toward women was his *modus operandi*. For example, in an audio recording captured during a 2015 New York Police Department sting operation, Weinstein admitted that he groped a model named Ambra Battilana Gutierrez, describing it as behavior he is "used to."[9]

---

[9] A 2015 audio recording of Weinstein aggressively attempting to coerce Battilana Gutierrez to come into his hotel room was published by *The New Yorker* on October 10, 2017 and is available at  https://www.youtube.com/watch?v=JVu02qk3-Jc (last accessed Nov. 2, 2017). It is also available with closed captioning at https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories (last accessed Nov. 2, 2017). When Battilana Gutierriez refused, saying "I don't want to be touched" and "Please, I don't want to do something I don't want to do," he tells her, "Don't ruin your friendship with me" and "Never call me again." *Id.*

37.     An executive who worked for Weinstein for many years reportedly told *The New Yorker*, "This wasn't a one-off. This wasn't a period of time. This was ongoing predatory behavior toward women—whether they consented or not."[10]

38.     The manner in which Weinstein set up, harassed, and assaulted Plaintiffs and the members of the Class followed a pattern. As *The New York Times* explained,

> Across the years and continents, accounts of Mr. Weinstein's conduct share a common narrative: Women reported to a hotel for what they thought were work reasons, only to discover that Mr. Weinstein, who has been married for most of three decades, sometimes seemed to have different interests. His home base was New York, but his rolling headquarters were luxury hotels: the Peninsula Beverly Hills and the Savoy in London, the Hôtel du Cap-Eden-Roc near the Cannes Film Festival in France and the Stein Eriksen Lodge near the Sundance Film Festival.[11]

39.     An employee who worked for Weinstein told *The New Yorker* that "the pattern of meetings was nearly uninterrupted in her years of working for Weinstein."[12]

40.     Since October 10, 2017, more than 60 women have reported that Weinstein used his power in the entertainment industry to sexually harass them. On information and belief, these reports are just the beginning of the revelation of the full scope of Weinstein's misconduct. All of these reports follow the same pattern. For illustrative purposes of Weinstein's pattern and practice of sexual harassment against Plaintiff and the Class, Plaintiff provides the following

---

[10] Ronan Farrow, *From Aggressive Overtures to Sexual Assault: Harvey Weinstein's Accusers Tell Their Stories*, THE NEW YORKER (Oct. 10, 2017), https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[11] Kantor & Twohey, *supra* note 1.

[12] Farrow, *supra* note 10.

non-exhaustive list of examples of Weinstein's predatory behavior that have been widely reported in the media:

41.     *Weinstein's pattern of using the guise of helping women with their careers was typically the start:*

a.     After Weinstein hired her for the lead in the Miramax-produced *Emma*, but before shooting began in or about 1994, Gwyneth Paltrow received a faxed schedule from her agents at Creative Artists Agency scheduling a meeting with Weinstein in his suite at the Peninsula Beverly Hills for a work meeting.[13]

b.     In 1996, starring in a new film to which Miramax had just obtained the rights, Judith Godrèche was invited to a breakfast meeting with Weinstein and a female Miramax executive to discuss the movie.[14] She later called a female Miramax executive to seek advice about the situation. The executive told her not to say anything, lest she hurt the film's release.[15] As Godreche described, "This is Miramax … You can't say anything."[16]

---

[13] Jodi Kantor & Rachel Abrams, *Gwyneth Paltrow, Angelina Jolie and Others Say Weinstein Harassed Them*, N.Y. TIMES (Oct. 10, 2017), https://www.nytimes.com/2017/10/10/us/gwyneth-paltrow-angelina-jolie-harvey-weinstein.html.

[14] *Id.*

[15] *Id*.

[16] *Id*.

      c.      Asia Argento, a 21-year-old actress with a role in a Miramax film released in the United States in 1999, was told during filming in 1997 to attend a party thrown by Miramax at a hotel and was brought to the hotel by another producer.[17]

      d.      In the 1990s, Rosanna Arquette was told to meet Weinstein for dinner at a hotel to pick up the script for a new Miramax film.[18]

      e.      In the 1990s, Weinstein invited Ashley Judd to the Peninsula Hotel for a business breakfast meeting concerning Miramax projects.[19]

      f.      In or about 1997, Weinstein invited himself to Mira Sorvino's apartment—after midnight—to tell her about "new marketing ideas" for a Miramax film she was in.[20]

      g.      In 2003, Dawn Dunning was invited by Weinstein's assistant to a meal with Weinstein at a New York hotel.[21] She had met Weinstein while she was waitressing in a nightclub, and he offered her a screen test at Miramax.[22]

      h.      Lucia Stoller was approached by Weinstein in 2004, who had a Miramax assistant call to set up a daytime meeting at the Miramax office in Tribeca, first with

---

[17] Farrow, *supra* note 10.

[18] *Id*.

[19] Kantor & Twohey, *supra* note 1.

[20] Farrow, *supra* note 10.

[21] Kantor & Abrams, *supra* note 13.

[22] *Id*.

Weinstein and then with a casting executive, who was a woman (which made Lucia feel safer).[23]

 i. In 2010, Weinstein told actress Emma de Caunes he was interested in casting her in the lead role of a TWC movie adapted from a book, asking her to come to his hotel room after lunch to get the book.[24]

 j. In January 2011, Weinstein invited Jessica Barth to a business meeting at the Peninsula Hotel to talk about TWC projects and her career. [25]

 k. In 2015, Italian model Amber Battilana Gutierrez met with Weinstein in the TWC offices for what she was told would be a "business meeting."[26]

42. *When the women arrived for their "meeting," they were isolated from the public or witnesses:*

 a. Although Lucia Stoller's meeting took place at Miramax, "[s]he was led to an office with exercise equipment in it, and takeout boxes on the floor. Weinstein was there, alone."[27]

 b. A producer invited Asia Argento, who was working on the Miramax-distributed movie *B. Monkey*, to what she thought was a party thrown by Miramax at the

---

[23] Farrow, *supra* note 10.

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.*

Hotel du Cap-Eden-Roc. She felt obligated to attend, but when the producer led her

upstairs, he took her to a hotel room "empty but for Weinstein."[28]

      c.     Weinstein sexually assaulted dancer Ashley Matthau when he visited the

set of Miramax's *Dirty Dancing: Havana Nights* in Puerto Rico in 2004.[29] He ordered her

into a car that took her to his hotel room, where he attacked her after she declined his

suggestion that she follow the lead of other high profile actresses whose careers he had

launched by sleeping with him.[30]

      d.     After Lena Heady appeared in a TWC film, Weinstein harassed her in

2005 at the Venice Film Festival, but Heady tried to laugh it off at the time.  Years later,

after a breakfast work meeting in a Los Angeles hotel, Weinstein told Headey to come to

his hotel room to pick up a script. In the elevator, the energy shifted, causing Headey to

warn Weinstein not to expect anything physical.  She described that Weinstein went

silent, apparently furious at her words. Weinstein's hand was on Heady's back, marching

her forward, while she felt completely powerless. When his key card didn't work,

Weinstein got very angry.  Weinstein then walked her back downstairs and paid for a car

---

[28] *Id.*

[29] Ellen Gabler et al., *New Accusers Expand Harvey Weinstein Sexual Assault Claims Back to '70s*, N.Y. TIMES (Oct. 30, 2017), https://www.nytimes.com/2017/10/30/us/harvey-weinstein-sexual-assault-allegations.html.

[30] *Id.*

to take her away from the hotel, whispering in her ear not to tell anyone about the incident.[31]

      e.      When Rosanna Arquette showed up for dinner at a hotel restaurant with Weinstein, she was told to meet him in his room.[32]

      f.      When Jessica Barth arrived at the Peninsula Hotel for a business meeting, Weinstein told her on the phone to come to his room.[33]

      g.      When Ashley Judd arrived at the Peninsula Hotel for a business meeting, she was told to meet him in his room.[34]

      h.      After a breakfast meeting with Weinstein and a female executive, the female executive left, leaving Judith Godrèche alone with Weinstein, who told her to join him in his room to discuss the Miramax film's marketing and an Oscar campaign.[35]

      i.      When Dawn Dunning arrived at the hotel for a meeting, she was told that Weinstein's earlier meeting was running late and to go to his suite.[36]

43.      *Once isolated, Weinstein battered, assaulted, or attempted to assault the women:*

---

[31] Joyce Chen, *Lena Headey of 'Game of Thrones' Alleges Harvey Weinstein Sexual Harassment*, ROLLING STONE (Oct. 18, 2017), https://www.rollingstone.com/movies/news/game-of-thrones-lena-headey-alleges-weinstein-harassment-w509515.

[32] Farrow, *supra* note 10.

[33] *Id.*

[34] Kantor & Twohey, *supra* note 1.

[35] Kantor & Abrams, *supra* note 13.

[36] *Id.*

a.      Rose McGowan: In a hotel room in 1997, "…HW raped me."[37]

b.      Lucia Stoller: "'He forced me to perform oral sex on him.' As she objected, Weinstein took his penis out of his pants and pulled her head down onto it. 'I said, over and over, "I don't want to do this, stop, don't."'"[38]

c.      Asia Argento: Weinstein left the hotel room and returned "wearing a bathrobe and holding a bottle of lotion. 'He asks me to give a massage. I was, like, "Look, man, I am no fucking fool."'" "[A]fter she reluctantly agreed to give Weinstein a massage, he pulled her skirt up, forced her legs apart, and performed oral sex on her as she repeatedly told him to stop." [39]

d.      Mira Sorvino: In 1995, while Sorvino was at the Toronto International Film Festival promoting the Miramax-produced *Mighty Aphrodite*, she found herself in a hotel room alone with Weinstein. Weinstein started massaging her shoulders and then chased her around the room.[40]

e.      Sophie Dix: Weinstein masturbated in front of her after Dix said "no a thousand times," causing Dix to lock herself in the bathroom.[41]

---

[37] Holly Christodoulou, *'I told you he raped me,'* THE SUN (Oct. 13, 2017), https://www.thesun.co.uk/news/4673738/rose-mcgowan-harvey-weinstein-rape-claims-amazon-jeff-bezos/, *quoting* tweet from Rose McGowan.

[38] Farrow, *supra* note 10.

[39] *Id.*

[40] *Id.*

[41] *Id.*

      f.      Emma de Caunes: Weinstein went into the hotel bathroom, turned on the shower, returned naked with an erection, and demanded she lie on the bed.[42]

      g.      Rosanna Arquette: Weinstein answered his hotel door in a bathrobe, tried to force Arquette to give him a neck massage, and pulled her hand toward his erect penis.[43] After Arquette refused Weinstein's unwanted sexual advances, the role she wanted in a Miramax movie went to somebody else.[44]

      h.      Jessica Barth: Weinstein demanded a naked massage in his bed.[45]

      i.      Ashley Judd: Weinstein appeared in a bathrobe, asking if he could give her a massage or she could watch him shower.[46] Describing her fear and panic at being propositioned by Weinstein, Judd said, "There's a lot on the line, the cachet that came with Miramax."[47]

      j.      Gwyneth Paltrow: Weinstein touched her, suggesting they head to his bedroom for massages.[48]

      k.      Angelina Jolie: Weinstein made unwanted advances on her in a hotel room.[49]

---

[42] *Id.*

[43] *Id.*

[44] Kantor & Abrams, *supra* note 13.

[45] Farrow, *supra* note 10.

[46] Kantor & Twohey, *supra* note 1.

[47] *Id.*

[48] Kantor & Abrams, *supra* note 13.

[49] *Id.*

l.      Judith Godrèche: After Godrèche declined to give him a massage, "he's pressing against me and pulling off my sweater."[50]

m.      Dawn Dunning: Weinstein, who had worn a bathrobe for their meeting, told Dunning that he had contracts for her for his next three films, but that she could only sign them if she would have three-way sex with him. When Dunning laughed, assuming Weinstein was joking, Weinstein became angry, stating: "You'll never make it in this business. This is how the business works."[51]

n.      Daryl Hannah: On multiple occasions, Weinstein tried to barge into her hotel room at night; she escaped out back doors; she used furniture to bar the door; and she had her male make-up artists present when Weinstein was able to secure a key to her room without her consent. *The New Yorker* reported: Weinstein "'had a key,' when Hannah was in Rome for the Italian premiere of Miramax's Kill Bill: Volume 2. Hannah recalled. 'He came through the living room and into the bedroom. He just burst in like a raging bull. And I know with every fiber of my being that if my male makeup artist was not in that room, things would not have gone well. It was scary.' [Hannah's make-up artist] remembered the incident vividly. 'I was there to keep her safe,'" he told *The New Yorker*.[52]

---

[50] *Id.*

[51] *Id.*

[52] Ronan Farrow, *Weighing the Costs of Speaking Out About Harvey Weinstein*, THE NEW YORKER (Oct. 27, 2017), https://www.newyorker.com/news/news-desk/weighing-the-costs-of-speaking-out-about-harvey-weinstein.

o.      Weinstein sat next to Amber Battilana Gutierrez on the couch in the TWC offices and began staring at her breasts, asked if they were real, and "lunged" at her, groping her breasts and attempting to put his hand up her skirt.[53]

p.      Paz de la Huerta—first rape: In November 2010, Weinstein offered de la Huerta a cab ride home after bumping into her at a hotel bar in New York and then demanded to come in for a drink: "'Immediately when we got inside the house, he started to kiss me and I kind of brushed [him] away,' de la Huerta said. 'Then he pushed me onto the bed and his pants were down and he lifted up my skirt. I felt afraid…. It wasn't consensual… It happened very quickly…. He stuck himself inside me…. When he was done he said he'd be calling me. I kind of just laid on the bed in shock.'"[54]

q.      Paz de la Huerta—second rape: In December 2010, Weinstein showed up in her building lobby after she came home from a photo shoot: "'He hushed me and said, "Let's talk about this in your apartment,"' de la Huerta said. 'I was in no state. I was so terrified of him…. I did say no, and when he was on top of me I said, "I don't want to do this." He kept humping me and it was disgusting. He's like a pig…. He raped me.'"[55]

44.     These were not isolated instances, but the practiced role and pattern of a sexual predator.

---

[53] *Id.*

[54] Rebecca Keegan, *Paz de la Huerta Says Harvey Weinstein Raped Her Twice. Will That Bring Him to Justice?*, VANITY FAIR (Nov. 2, 2017), https://www.vanityfair.com/hollywood/2017/11/paz-de-la-huerta-harvey-weinstein-allegations (alterations in original).

[55] *Id.* (alterations in original).

C.     **Like the Class members and countless others, Plaintiffs' experiences followed the same script.**

1.     **Plaintiff Caitlin Dulany's experience with Weinstein, Miramax, and the Weinstein Sexual Enterprise.**

45.     Caitlin Dulany met Harvey Weinstein while she was standing outside the Miramax office on a winter day in 1996. She had been working as an actor for several years, and had moved to New York to pursue work in independent films. When Weinstein—the most important independent film producer in the world—stopped to introduce himself as he was walking into the building, she felt very lucky. Weinstein asked Dulany what she was doing at the office, and she told him that she was there to do a reading. They talked for several minutes about the business; he said that he remembered what it was like for him starting out. To Dulany, Weinstein was relatable and disarming—he seemed as though he wanted to befriend and mentor her with no strings attached. They exchanged contact information.

46.     In short order, Weinstein contacted Dulany and invited her to a screening of one of his movies. When she met him in the lobby afterward, surrounded by his employees, he introduced her as "my friend Caitlin." He asked Dulany what she thought of the film, and she shared her opinion, joining in the conversation with his young employees.  She was grateful to meet people in the independent film business.

47.     Later, Weinstein invited Dulany to a party in Tribeca, near the Miramax offices. The party was comfortable and enjoyable; there were many industry people talking shop, and she was again grateful to join in. Weinstein was friendly but proper; he acted like a professional mentor. Throughout their time together, Weinstein told Dulany that he wanted to help her with her career because he felt that she had potential. She trusted him. In general, Dulany felt engaged with the independent film community and excited about her work.

48.     Weinstein proposed to host a meeting between Dulany and a high-powered manager of several famous people as a favor. Dulany had an uneasy feeling about being offered "a favor," in part because her agent discouraged it.

49.     In the lobby before the meeting, the high-powered manager told Dulany that Weinstein had forced her to come. Dulany told the manager that she did not want to be there either. In the meeting, the manager seemed angry and nervous, as though she knew Weinstein was trying to bully her. Weinstein made a pitch for Dulany. He said that he really believed in her and thought she was special, and he demanded that the manager take her on "as a favor to me." It seemed to Dulany as though Weinstein as trying to demonstrate he held power over her career. The manager refused Weinstein's demand because she already represented Suzie Amis, who would be competing against Dulany for parts. Weinstein relented. When the manger left, he turned to Dulany and told her he would think of a next step. Dulany left the meeting feeling ashamed and embarrassed.

50.     Weinstein then invited Dulany to a dinner, and he offered to pick her up at her apartment. Based on their previous encounters, there was no indication that the dinner would be anything but platonic. When Weinstein arrived, Dulany let him in to her long, narrow studio apartment. They walked in the door through the kitchen and past her bed, and they sat down in the "living area" to chat. After the conversation dragged on, Dulany became anxious to leave for dinner. She excused herself to use the bathroom.

51.     When she emerged from the bathroom, Dulany was shocked and alarmed to find Weinstein naked, in her bed. He stood up. She rushed past him into the living area and said, with her adrenalin pumping, "Harvey put your clothes back on." Weinstein stood for what seemed to Dulany like an eternity, staring blankly, as if they were in a standoff. Finally, he dropped his

eyes and mumbled something to the effect of, "fine, if it's such a big deal to you." He then got dressed and left the apartment.

52.     When Weinstein left, Dulany felt shocked, angry, and betrayed. But she remained optimistic. She told herself the whole thing must have been a misunderstanding. And given that he had never acted improperly toward her before, and he got dressed and left when she asked him to, she did not give up on Weinstein as a mentor. She did not want to lose the mentorship of an important, powerful person in the industry. Weinstein had gone to great lengths to gain her trust, and to make her believe that he would be loyal to her. Even after the incident in her apartment, Dulany believed that their friendship was important to him.

53.     Dulany confided in her sister and several close friends about the incident with Weinstein. She told them that she was unnerved and angry by his behavior. They agreed. Still, no one was surprised that a movie producer propositioned a young actor inappropriately. To Dulany, navigating those situations was part of being in the business at the time.

54.     Two months later, Dulany attended the Cannes Film Festival to promote her most recent film, *Rescuing Desire*. There she ran into Weinstein, whom she had not spoken to since the incident in her apartment. He greeted her, acting like nothing had happened, and invited her to a gathering on a friend's yacht. She was relieved that she had not alienated Weinstein by refusing him in her apartment. Dulany accepted the invitation to the yacht, where Weinstein introduced her to industry people.

55.     Several days later, Weinstein invited Dulany to a premiere of a Miramax film, followed by a benefit dinner for the Elizabeth Taylor AIDS Foundation.  Dulany sat alone in the theater during the film premier, and sat at a dinner table with Elton John and Leonardo DiCaprio. Weinstein stopped at her table to greet her in front of a crowd of A-list celebrities. She

appreciated him being friendly toward her, but, she felt uneasy in a room full of famous strangers, with Weinstein as her only lifeline.

56.     After the dinner, Dulany was told that there was a car waiting outside to take her to the after party at Hotel du Cap. As she drove along the water toward the exclusive hotel, about eight miles from the city, she tried to understand why she was in the car alone. Why wasn't she sharing a car with other after-party attendees? If she wanted to leave, how would she get back to her hotel? Why, given that the dinner was in walking distance to many hotels and bars, was the after party being hosted far away, on the outskirts of town?

57.     At that moment, Dulany realized she was trapped. She realized that Weinstein was an important guest at Hotel du Cap, and that he had ordered the car. As the drive continued, she prayed for her own safety.

58.     Once they were alone in his hotel room, Weinstein did not say much to Dulany. At that point, Dulany was at once terrified and resigned; she knew that Weinstein had managed to isolate her, and she blamed herself for letting it happen. She was too far from her hotel or anyone who could provide help to try to escape. Not only that, she thought that Weinstein would hurt her physically if she tried—after all, he was about three times her size. If he did not become violent, he would certainly hurt her career if she tried to leave.

59.     Weinstein imprisoned Dulany in his room and sexually assaulted her. First he undressed her and performed oral sex on her without her consent. She stared at the ceiling, frozen solid with fear, and waited in agony for him to finish. She did not consent, reciprocate, or respond in any way. Inside, she felt herself shutting down.

60.     As her mind raced with fear and panic, she realized that Weinstein expected sex from her in return for entertaining her at an A-list party. She closed her eyes, disgusted and

- 26 -

ashamed, and prayed that Weinstein would not try to penetrate her. Then Weinstein began to masturbate. When he ejaculated, Dulany felt a wave of nausea run through her body. She remained on the bed, frozen and silent, and fell asleep.

61.     When Dulany woke up and opened the hotel room door, there was a small crowd of Miramax staffers waiting outside the suite to go in and start their day. No one said anything or looked at her. Dulany then suspected that seeing a woman emerge from Weinstein's hotel suite in the morning was a regular occurrence for them.

62.     When Dulany left Hotel du Cap, she decided that she would wipe the assault from her memory. She swore to herself that she would never speak of that night to anyone, ever. She knew that if she reported him, Weinstein would destroy her life.

63.     But even though she did not tell a soul for more than twenty years, her life changed from that moment forward. Weinstein's assault traumatized Dulany. It had devastating effects on Dulany's personal and professional life, and it caused her extreme pain and suffering and emotional distress.

64.     Four months later, Dulany moved to Los Angeles. She did not want to be involved in the independent film business at all—it felt tainted to her. Even though she loved independent films, she convinced herself that she would rather work in television. She was afraid to be in Weinstein's world.

65.     In Los Angeles, she quickly married a person with whom she felt safe and secure. Her anxiety was unbearable, and she desperately needed someone to support her. At the same time, she felt that she was hiding a secret; that part of her was missing. She could never truly be herself around anyone, because Weinstein had taken a part of her that she would never get back.

- 27 -

Weinstein's assault had a profoundly negative effect on her marriage, as it has on all her romantic relationships since then.

66.    After Dulany gave birth to her son, she spent the first few years in a state of debilitating anxiety about her child's safety and security. It seemed as though parenting was more frightening and anxiety-ridden for her than it was for others. Again, she felt anxious, isolated, strained, and lonely; she felt as though she was different from everyone around her.

67.    Dulany suffered from severe anxiety and depression. With an intense feeling of detachment, she went through the motions of life—attending auditions, acting on television shows, interacting with friends and colleagues. It took tremendous effort to make it through simple auditions and readings. Work that had felt effortless before Weinstein's assault now took everything she had. She shied away from auditions for roles that she would have tried for with confidence and excitement prior to the assault.

68.    In nearly twenty-two years since Weinstein's assault, Dulany has experienced a pervasive feeling that she would rather be dead. She did not consider taking her life, but there have been times when she desperately wished that she could give up. Things that had previously brought her joy—particularly her work as an actor—now only caused her to struggle.

69.    Dulany has attempted to compartmentalize what happened to her in the Hotel du Cap, but she was only able to divide herself. The image she attempted to present to the world was happy and secure, but inside she was deeply anxious, fearful, and exhausted. The divide only made her feel more detached, isolated, and lonely.

70.    Dulany did not tell anyone what happened in Cannes until after this lawsuit was filed. She wrote a story for The Wrap about Weinstein taking his clothes off in her apartment,

and did a BBC Radio interview.[56] However, even after widespread reporting on Weinstein's

sexual abuse, she still could not bring herself to share the story of Weinstein's assault in the

Hotel du Cap. She continued to fear retaliation and damage to her reputation. This is the first

time Dulany is sharing her story with the world.

> **2.     Plaintiff Larissa Gomes' experience with Miramax and the Weinstein Sexual Enterprise.**

71.     In 2000 Ms. Gomes was working as an ensemble dancer and actor on the set of

the Miramax-produced movie *Get Over It* in Toronto, Ontario, Canada. As Gomes was sitting on

set between takes, Weinstein approached her and introduced himself. As they talked, Weinstein

told Gomes that he was impressed by her and would like to schedule a meeting.

72.     At the time, Gomes was a young, relatively inexperienced dancer, singer, and

actress, Gomes found Weinstein's interest in developing her talent "intoxicating." She hoped to

use the opportunity to show Weinstein her value as a performer.

73.     Gomes arrived at the Sutton Place hotel in Toronto at 8:30 a.m. for the meeting.

When Gomes arrived at the hotel, she called up to Weinstein's penthouse room and suggested

that they meet in a bistro across the street. He refused, commanding, "I don't bite, come on up."

74.     Gomes then called her agent to tell her that she did not feel comfortable meeting

in Weinstein's hotel room. The agent placed a call to Weinstein, who berated her for not

accepting that people set up meetings in hotel rooms in Hollywood all the time. Another agent on

---

[56] Caitlin Dulany, *Why I Waited So Long to Share My Harvey Weinstein Saga (Guest Blog)*, THE WRAP (Nov. 28, 2017), https://www.thewrap.com/harvey-weinstein-story-waited-so-long-sexual-misconduct/; Dulany's story also appeared in a Radar Online Article. *See* Radar Staff, *New Harvey Weinstein Claims Victim Claims Shocking Sex Assault*, RADAR ONLINE (Nov. 14, 2017), https://radaronline.com/videos/harvey-weinstein-alleged-sex-assault-victim-caitlin-dulany-speaks-new-interview/

the call challenged Weinstein's assertion, and he then agreed to have his head of casting present for the meeting. Gomes then agreed and proceeded to Weinstein's room.

75.     As Gomes approached Weinstein's room on the penthouse floor, she saw an assistant scurrying with a pile of papers. Although Gomes had been wary of meeting Weinstein in his hotel room, she felt relieved when she found that the penthouse floor had the air of an intense office suite.

76.     Weinstein's assistant, Jill Messick, and the film's music director, Randy Spendlove, attended the meeting. During the meeting, Weinstein told Gomes that he would like her to read for three upcoming films, all to be shot in Toronto, and that Miramax shot eight films per year in the city. He impressed upon her that he needed a pool of local talent that he could rely on, and that her ability to act, sing, and dance made her a perfect fit.

77.     Weinstein then arranged for Gomes to perform background vocals on "The September Song" of the *Get Over It* soundtrack, and to spend some social and professional time with Spendlove. Gomes appreciated the opportunities Weinstein was giving her and felt that he was bringing her into his inner circle.

78.     Shortly thereafter, Weinstein set up an early evening meeting with Gomes in his hotel room. Gomes felt comfortable because their previous meeting had been professional. After Weinstein opened the door to his room, he immediately excused himself for a phone call. After screaming throughout the phone call, he hung up forcefully, yelling that Martin Scorsese was killing him with his budget for *Gangs of New York*. Gomes felt intimidated.

79.     Weinstein then placed a stack of scripts on the table front of Gomes, and told her that she would read for the upcoming productions of *Serendipity* and *40 Days and 40 Nights*

because she'd be "perfect." He offered her champagne, and his demeanor changed from agitated to calm. Feeling comfortable, she accepted the drink.

80.     Weinstein then told her that he does not often meet women like her, explaining when he meets someone he likes "they usually don't mind being treated elegantly when I come into town." Gomes responded, "You mean like a prostitute?" Weinstein laughed. Gomes's spirits began to sink as she realized Weinstein had scheduled their meeting for sex. She began trying to figure out how to escape the room without offending him. Her heart was racing and she felt sick.

81.     She asked nervously, "Aren't you married?" "Yes, I am happily married," he responded. Then he stood up and retreated to the bedroom. Gomes breathed in relief, thinking she may have diffused the situation. She felt frozen to her seat.

82.     After approximately five minutes, Weinstein called to Gomes from the bedroom. With a feeling of dread, she approached the bedroom slowly. Weinstein was laying on his back on the bed. He claimed to have a headache. Very frightened and uncomfortable, Gomes offered to find some Advil and leave him in peace.

83.     Weinstein demanded she lay down with him instead. Weinstein told her she should give him a massage. He demanded to see her breast. Gomes was shocked.

84.     Instinctively, her mind frozen and unable to respond with words, Gomes left the bedroom and went to the sofa, where she had left her bag. At that point, Gomes felt that everything was happening in slow motion. She began to gather her belongings as she sat on the sofa. Her heart was racing and she desperately wanted to leave. Still, she felt frozen in place. Weinstein followed her out of the bedroom in his bathrobe. Gomes prayed she could get out of the hotel room without being assaulted.

85.     Weinstein used his bulk to lean over the back of the sofa where Gomes was sitting. He began to massage her shoulders and neck. Gomes felt nauseated and her breath became short. Extremely uncomfortable, Gomes tried to pull away but Weinstein would not let her. Gomes felt trapped and could not get out of Weinstein's grasp.

86.     Weinstein then forcefully pushed his hands toward her breasts, saying "you're so tense, just relax, friends can give each other massages you know." Weinstein seemed smug, as if he was amused by Gomes's fear and anxiety. Gomes wriggled out of his grasp and jumped off the couch away from Weinstein's reach. She was in imminent fear for her life and safety.

87.     Weinstein reacted angrily, yelling at Gomes in a threatening tone: "You know Gwyneth Paltrow and Ashley Judd were exactly where you are at one point. Look at them now. Ashely Judd had no problem fucking me." Gomes felt paralyzed with disbelief.  Scared, she blamed herself for having been naïve enough to think Weinstein would conduct himself professionally.

88.     As her fear and panic multiplied, Gomes tried to come up with a plan to leave the room. But she was trapped. Weinstein would not let her leave. He seemed angry and agitated. She was a small woman trying to escape a huge, hulking man who made clear he was going to get what he wanted.

89.     She tried to remain calm and said the only thing she could think of that might convince Weinstein to release her: "I think I should go now, my boyfriend is waiting for me, and he will be worried." Weinstein laughed. As Gomes began to retreat, Weinstein grabbed her and tried to kiss her. Gomes refused and turned away, as Weinstein sneered and pointed to himself, "Who could kiss a face like this?"

90.     Gomes ran out of the room distraught and shaking with fear. She never wanted to see Weinstein again, let alone work with him. At the same time, she was devastated that his interest in her talent had not been genuine, and that she would never be part of the Miramax talent pool.

91.     Gomes confided in her agent and her close friends about the assault, but she did not report it because she feared for her safety and career. Gomes knew from another actor's account that Weinstein could and would destroy her if she complained about his sexual misconduct.

92.     At the time, Gomes questioned whether what happened to her was "normal" and thought that it "didn't count" because she got away. But she could not shake the extreme physical and emotional distress she felt. Since then, she has tried to avoid working with men, for fear of her safety.

93.     Although she continued to work as an actor, Gomes carried the trauma of Weinstein's attack with her. She never worked with Miramax or Weinstein again, and she never regained the momentum that she had before meeting Weinstein. Feelings of fear and shame have resurfaced regularly, which have negatively affected her personal and professional life. Harvey Weinstein's attack damaged Gomes physically and emotionally, and it damaged her career.

### 3.     Plaintiff Melissa Thompson's experience with Weinstein, The Weinstein Company, and the Weinstein Sexual Enterprise.

94.     Upon receiving her MBA from Columbia Business School in 2011, Thompson consulted for a technology startup, which included Intercast Network Inc. ("Intercast")[57] in its portfolio.  Intercast is marketed as an enterprise video platform that enables the distribution of

---

[57] https://www.linkedin.com/in/bizmelizz/; http://www.melissathompson.com/

time-sensitive live or recorded video at scale, wrapping it with viewer engagement functionality, and allowing real-time optimization and analyses. Intercast was launched by the founders, with Thompson as the Director of Business Development, on September 12, 2011, in San Francisco at the TechCrunch Disrupt Conference.[58] Early clients included NBC Universal Pictures, President Obama, and Organizing for Action.[59]

95.    While Thompson was out to dinner in or about mid-September 2011 with friends, Harvey Weinstein approached their table to say hello to her friends who then introduced her to Weinstein. Later, as she went to the bathroom, he literally bumped into her in a narrow corridor. Thompson knew she had one chance to make a pitch for the venture for which she worked, so she did—quickly explaining how the technology could be used in the film industry. Weinstein wrote his email on the back of a business card and told her to email him to set up a meeting with his marketing team. Thompson did email Weinstein, and Weinstein confirmed a meeting at his TWC office via email.

96.    On September 29, 2011, Thompson met with Weinstein to pitch Intercast at The Weinstein Company's office at 375 Greenwich Street in New York City. Thompson was shown to Weinstein's empty office where she set up her laptop to demonstrate the digital marketing platform. She turned on the video recording on her computer to use the live feed of her and the pitch attendees to demonstrate how Intercast works.

---

[58] https://www.youtube.com/watch?v=fONEJOsgUrY. *See also* Sarah Perez, *Live Streaming Video Platform IntercastNetwork Brings Real-Time Feedback To Online Broadcasters*, TECHCRUNCH (Sept. 15, 2011), https://techcrunch.com/2011/09/15/live-streaming-video-platform-intercastnetwork-brings-real-time-feedback-to-online-broadcasters/

[59] Brand Knew, *Case studies*, https://www.brand-knew.com/case-studies/intercast/ (last visited May 30, 2018); Propper Daley, *Intercast*, http://dev.propperdaley.com/intercast/ (last visited May 30, 2018).

97.     As Weinstein walked into his office, he repeated several times to the people just outside his office, "Don't interrupt, don't interrupt."  He then shut and locked his office door. He was alone.

98.     Thompson stood up from her seat and extended her right hand to shake his hand. Weinstein deflected her hand with his left hand, moving her right hand towards his shoulder, and then ran his hands from her upper back around to her lower back, commenting "That's nice."

99.     After making small talk, Weinstein asked Thompson "So am I allowed to flirt with you?" Thompson responded: "Ummmmm. We'll see. A little bit." Thompson felt cornered, as if she had to play along to not blow the pitch before it had even started. Weinstein became curt and said: "Oh, then I won't. What do you want?" making clear that she had to play if she wanted his business.

100.     Thompson then redirected Weinstein's attention to business and to the technology demonstration on her computer. She explained Intercast, its technological capabilities, and how President Obama and TWC's competitors were using the technology.

101.     Weinstein then asked how the technology would work if he wanted to show a trailer of his Marilyn Monroe movie.  As Thompson began to respond, Weinstein reached down and began caressing her leg and moving his hand under her dress. Thompson panicked. Her legs felt wobbly.  Her speech was interrupted. She hesitated and then continued with the pitch, believing that if she didn't react he would stop.  Weinstein mumbled: "it's fun when you do this," referring to his hand caressing her thigh, but then tried to reassure her that it was part of the deal, stating: "but I am actually seriously having a conversation with you."

102.     Thompson continued her pitch, focusing on the technology's capabilities and the cost of the options. She tried to keep the pitch business-like, not returning Weinstein's caresses

- 35 -

and keeping her elbows on the table.  She worried that he would perceive any response to his behavior as welcoming his actions. She also feared that, if she angered him, his advances would become more forceful.

103.     As Thompson continued to make the pitch and run through examples of where and how Intercast had been used, Weinstein caressed her shoulder, and ran his hand up and down her arm. When he ran his hand up her leg and under her dress, Thompson moved away from him and attempted to delicately balance saving face, while shutting down his actions,to get through the meeting. Thompson felt her brain shifting between fight or flight mode. As his caresses increased, she lost her ability to focus on the pitch, forgot what she was saying, and could not think clearly.

104.     During the pitch, Weinstein stood up to call Stephen Bruno, TWC's President of Marketing (who is now at Netflix). Weinstein said, "Steve, what are you doing? Where are you, at 99 Hudson? Can you take 5 minutes out? I want you to meet Melissa Thompson, whose got this Intercast to do spots and all sorts of things. Come up with a 375. Ok. Thanks."

105.     Weinstein hung up and asked Thompson if she wanted a glass of water. He told her to follow him to the kitchen attached to his office. She thought this was a good diversion to the pattern of impropriety and power-wielding that Weinstein orchestrated. But, when they got to the kitchen, Harvey quickly pivoted and captured her, pinning her against the refrigerator, making sure he was between her and the exit.

106.     When they returned to the office, Weinstein told Thompson he needed to work on editing a movie for an hour and asked Thompson to meet him for a drink at Tribeca Grand Hotel at 5:30 p.m., promising to make a deal for Intercast's services. Thompson felt pressured to do so in order to secure the deal.

107.    Thompson left TWC's offices, arrived at the Tribeca Grand, set up her laptop to work in the restaurant area, and ordered a Diet Coke.

108.    At 5:30 p.m., Weinstein arrived in the restaurant, and without pause, asked for the check. He then threw cash on the table, told Thompson to grab her drink and follow him. He departed towards the elevators, moving Thompson along with him.

109.    Thompson knew that there were screening rooms at the Tribeca Grand, regularly used for entertainment business meetings, and expected that was where they were headed. They exited the elevator on the third floor.

110.    During this time, Weinstein was talking to Thompson about their mutual friends, including her boyfriend, as well as Weinstein's wife. Based on the nature of the conversation, Thompson felt more comfortable, believing that Weinstein was acknowledging he was not going to try anything untoward given their respective relationships.

111.    Just a short distance down the hall, Weinstein opened a door and hustled Thompson into a sitting room in his hotel suite. Thompson was surprised that she found herself in his private room. In a desperate attempt to set a professional tone for the meeting, Thompson opened her laptop on the coffee table directly in front of the entrance and kneeled down to set it up. Weinstein walked to a refrigerator in the far corner of the room, opened a Diet Coke, and then sat behind her on the couch and began rubbing her shoulders.

112.    Thompson kept trying to shift away from him, but Weinstein used his strength to maintain contact and continued to massage her shoulders. Thompson racked her brain on how to distract him.  She had gone through all of the pitch materials and made a quick and desperate decision to try to distract him with a new video. As he was watching it, Thompson excused herself to use the bathroom and tried to figure out how to leave the hotel room politely. She sat in

the bathroom, running through scenarios on how to excuse herself from the room. She racked her brain, scared and upset that she was in Weinstein's hotel room.

113.     When Thompson came out of the bathroom, however, Weinstein had no pants on. Weinstein walked towards her, naked from the waist down, and told her to join him in the shower. She declined. He then reached behind her dress and pulled the zipper down. Thompson panicked and tried to pull away.

114.     Thompson tried to pull the zipper back up. As she did so, Weinstein lowered himself to his knees and tried to take her stockings off. As he pushed one leg of her stockings down, she tried to pull the other one up. His hands were everywhere and she could not get out of his grasp or keep up with deflecting him. While Weinstein ran his hand up Thompson's bare leg, she tried to back away from him and declared in a raised voice that she did not think her boyfriend would appreciate what he was doing. While maintaining a hold on her and with his face below her waist, Weinstein responded in a resolute tone: "Fuck him."

115.     By then, he had maneuvered Thompson into the bedroom. Blocked by Weinstein's position and size, Thompson was petrified and felt cornered. She felt nauseous, and did not know how to extricate herself from the situation.

116.     Weinstein then took off his shirt and laid face down on the bed. Apparently sensing her hypervigilance, Weinstein told her "you don't have to do anything; just rub my shoulders." Thompson felt she had no good choice in the situation. She told herself that if she could leave after the massage—if this was the extent of the assault—that she would be relatively unscathed.  It seemed like the only way out of a situation over which she had no control.

117.     When she sat on the bed, he flipped over onto his back and aggressively tried to undress her. He tried to pull off her stockings again, while she resisted, leaving one stocking on

and one stocking off. He pulled her dress up, exposing her underwear, despite her attempts to keep herself covered.

118.    Weinstein then started to masturbate, demanded that she "come here," and pushed her head between his legs, in an attempt to force her to fellate him. Thompson viscerally and forcibly refused. She jerked away as hard as she could, visibly upset. Thompson was shaking uncontrollably and breaking out in hives.

119.    In response to Thompson's jerking away, Weinstein grabbed her, using brute force to push her flat on the bed on her stomach as he pulled her dress up and moved her underwear to the side. Thompson was fighting back, but could not out-muscle him.

120.    Weinstein held Thompson down and raped her. Thompson closed her eyes, traumatized, praying for the assault to end. Eventually, Weinstein withdrew and began masturbating next to her as she scrambled to create distance from him. Weinstein ejaculated on the bed, immediately following which his demeanor changed and he acted like nothing had happened.

121.    Thompson felt completely dissociated and ill. Covered in hives, Thompson couldn't think straight or breathe.

122.    Acting like everything was normal, Weinstein again asked Thompson to take a shower with him. She refused and Weinstein proceeded to shower alone. He masturbated in the shower where Thompson could see him while Thompson got dressed and gathered her things to leave.

123.    Before she left, Weinstein began talking to her about contracts with Intercast and for roles he had in mind for her, and told her he would set up a meeting with TWC colleagues.

- 39 -

124.     Thompson was completely unnerved, panic-stricken, and in a state of shock and disbelief.  Thompson felt nauseous and distressed. Moments of the assault that just occurred flashed in her mind—something that would continue for years to come. She tried to gather herself and left the room alone, Weinstein now standing in an open bathrobe after his shower. Thompson felt dirty and ashamed.

125.     Thompson confided shortly thereafter in her then-friend, Ambassador Paolo Zampolli, who told her these things happen in business and she would need to deal with it.  She also confided in a girlfriend, but she did not report it because she feared for her safety and career. She knew that Weinstein could and would destroy her if she complained about his sexual misconduct.

126.     On or about October 13, 2017, immediately after the first story broke of Weinstein's assaults, Thompson received several emails from Zampolli, insisting that she call him ASAP. Thompson was suspicious given the timing of his urgent outreach because she had not spoken with Zampolli in five years. Thompson thus called Zampolli, and recorded the call.

127.     On this call, Zampolli described a feud he had, pitting a team of Hillary Clinton and Harvey Weinstein against a team of Zampolli and Donald Trump. Zampolli described threats Weinstein had purportedly made against Zampolli and his family. Zampolli described a campaign of fear apparently designed (for purposes of the call) to make Thompson believe that Zampolli was on her side against Weinstein.

128.     During this October 12, 2017 call, Zampolli described several other women (by name) who were forced to "fuck" Weinstein or "suck his dick" because one had a project which Weinstein was producing and another was a model on Project Runway.  Zampolli then said:

> All of these girls are getting together and they are going to be
> represented by Brafman.

- 40 -

> *Benjamin Brafman.* [said with emphasis in audio recording]
>
>          \*              \*              \*
> He is the biggest criminal lawyer in America. I think you should speak to him.

After additional cajoling from Zampolli, including implying that Thompson could easily settle her claims with Weinstein through Brafman's representation of her, Thompson agreed that Zampolli could put her in touch with Brafman's firm.

129.     The next morning, on October 13, 2016, Zampolli sent an email introducing Thompson and Alex Spiro, an attorney then working for Brafman.

130.     Over the course of multiple telephone conversations, texts, and emails (to and from Spiro's email address at aspiro@braflaw.com) in the next few days, Spiro purported to interview Thompson for the purpose of analyzing her claim against Weinstein. Thompson understood throughout the conversations and correspondence that everything she sent Spiro was confidential and for the purpose of seeking legal advice.

131.     Thompson and Spiro even exchanged communications on legal strategy to be employed by the victims against Weinstein.

132.     On October 13, 2017, Thompson expressed concern that her case had passed the statute of limitations. In response, Spiro indicated that there were "loopholes" for that. This further cemented Thompson's belief that Spiro was working on a case on her behalf.

133.     On October 16, 2017, Thompson inquired of Spiro whether he was still interested in representing her. He responded, in writing: "Correct stick with me."

134.     On October 20, 2017, Spiro suggested that Thompson also speak to attorney Judd Grossman, who was known to specialize in arts, for purposes of mounting a media-related strategy in addition to Brafman's pursuit of litigation.

135.    On October 23, 2017, Thompson signed a retainer agreement with Grossman, LLP, which provided in pertinent part: "Other attorneys, professionals, and outside counsel, including Alex Spiro, Esq., also will work in connection with your representation…."

136.    On November 8, 2017, Weinstein publicly announced that he had hired Benjamin Brafman to represent him in New York regarding allegations of sexual assault. According to Brafman, he had been on Weinstein's defense team "for awhile."[60]

137.    Yet, as of November 8, 2017, neither Brafman, Spiro, nor anyone else from Brafman & Associates LLP had declined or terminated their representation of Thompson. Grossman LLP also had not terminated its agreement with Thompson.

138.    On November 8, 2017, upon hearing the news that Brafman represented Weinstein, Thompson called Zampolli, upset that he had referred her to Weinstein's lawyer under the guise that Brafman was representing women against Weinstein.

139.    At the outset of the call, Thompson said she had just read a headline that Benjamin Brafman was representing Weinstein. After some hemming and hawing, Zampolli responded: "I don't really care, you know."

140.    Upset, Thompson explained that she had sent video evidence of Weinstein's assault of her to Brafman's partner Alex Spiro based on Zampolli's introduction:

> Zampolli:    "To which email you sent the video?"
>
> Thompson:   "Brafmanlaw."
>
> Zampolli:    "Wow. …That's a huge, huge, huge case of collusion…"

---

[60] Karen Freifeld, *Harvey Weinstein hires NY defense lawyer Benjamin Brafman*, REUTERS (Nov. 8, 2017), https://www.reuters.com/article/us-weinstein-assault-lawyer/harvey-weinstein-hires-ny-defense-lawyer-benjamin-brafman-idUSKBN1D908C.

141.    Thompson confirmed with Zampolli that Brafman purportedly told him that he was representing victims of Weinstein. Zampolli stated: "Yes, the guy was representing girls…. I just wanted to help the girls because I think you all fucking got screwed.…"  Thompson asked again at the end of the conversation: "I have a question: At the time did Brafman say he was representing girls?"  Zampolli responded: "Yes, that's what he told me."

142.    Also, at 9:26 p.m. on November 8, 2017, Thompson texted Spiro, inquiring of the apparent connection with Weinstein "through Brafman" and advising that she felt "super uneasy."

143.    Spiro texted in response:

> What? No. I don't work there.
> Nor do I rep anyone involved.

And then he went silent.  Spiro had never informed Thompson that he intended to or had changed firms, nor what happened to the confidential information she had shared with him for purposes of representing her.

144.    Thompson immediately felt ill and fearful. She had shared important evidence against Weinstein with the very law firm who represented Weinstein—unbeknownst to her. She felt like she could not trust anyone. That law firm had informed her she did not need to worry about the statute of limitations and lulled her into a sense of security regarding her claims.  All of her fears—the very reasons she did not come forward immediately after she was assaulted—had been realized. Weinstein had used his network to show her just how far his reach stretched into her own circle.

145.    Thompson closed all the blinds in her home, worried that Weinstein would go to any means to ensure she was silenced. Thompson withdrew into herself again, unsure of whom she could trust.

- 43 -

146.     The fact that Thompson has been targeted for apparent investigation and deception by the Weinstein Sexual Enterprise has caused Thompson significant additional distress and fear, as well as damage to her business and property, including but not limited to her causes of action against the members of the Weinstein Sexual Enterprise.

**D.     The Complicit Producers facilitated Weinstein's predatory behavior.**

147.     The "Complicit Producers" often aided and abetted Weinstein in the commission of his sexual misconduct. For example, female employees of TWC and Miramax were often used to make Weinstein's victims feel safe. The employees would initially join a meeting along with a Class member or woman in whom Weinstein was interested. Weinstein would dismiss the employee, leaving him alone with his female target.[61]

148.     Sixteen current and former executives and assistants at TWC told a reporter from *The New Yorker* about a pattern of professional meetings that were pretexts for sexual advances on young actresses and models. "All sixteen said that the behavior was widely known within both Miramax and the Weinstein Company."[62]

149.     Weinstein also required multiple groups of TWC employees to facilitate his sexual encounters with women. In part, Weinstein required executive assistants to schedule and help arrange sexual (or possible sexual) encounters for him, even directing them to essentially badger women who refused or expressed reluctance into accepting a "meeting" with him. Additionally, on multiple occasions, Weinstein required junior executives to meet a woman and discuss working in the entertainment industry generally or on specific TWC projects, because he

---

[61] Farrow, *supra* note 10.

[62] Farrow, *supra* note 10.

was interested in her sexually and wanted the executives to help put the woman at ease before he made any sexual advances or because she had already submitted to his advances.[63]

150.    Female assistants at TWC were also required to procure Weinstein's erectile dysfunction shots, one of whom received a bonus for obtaining them and was at times directed to administer the injections. Other TWC witnesses described ensuring that Weinstein had an adequate supply of erectile dysfunction shots in his travel bags at all times. Some were tasked with preparing a private room at TWC where Weinstein was to have sexual encounters, and then cleaning up the room when the encounters were over. They occasionally found articles of women's clothing that had been left behind.[64]

151.    Irwin Reiter, the Executive Vice President of Accounting and Financial Reporting at TWC from 2005 to the present, who previously worked in the same capacity at Miramax from 1989 to 2005,[65] sent messages to Emily Nestor, a temporary employee of TWC, who alleged that she was harassed, describing Weinstein's "mistreatment of women" as an ongoing problem at TWC.[66]

152.    A female executive at the Complicit Producers told *The New Yorker*: "There was a large volume of these types of meetings that Harvey would have with aspiring actresses and models." "He would have them late at night, usually at hotel bars or in hotel rooms. And, in

---

[63] Verified Petition ¶ 25, *People v. The Weinstein Company LLC et al.*, No. 0450293/2018 (N.Y. Sup. Ct. Feb. 11, 2018).

[64] *Id.* ¶ 45.

[65] https://www.linkedin.com/in/irwin-reiter-58828a4/.

[66] Farrow, *supra* note 10.

order to make these women feel more comfortable, he would ask a female executive or assistant to start those meetings with him."[67]

153.    A female employee at TWC, Lauren O'Connor, wrote in a memo obtained by *The New York Times* that Weinstein required her to schedule casting discussions with aspiring actresses after they had private appointments in his hotel room. "She suspected that she and other female Weinstein employees, she wrote, were being used to facilitate liaisons with 'vulnerable women who hope he will get them work.'"[68]

154.    Mark Gil, the former president of Miramax Los Angeles from approximately 1994 to 2002,[69] told *The New York Times* that behind the scenes at Miramax, Weinstein's treatment of women "was the biggest mess of all."[70]

155.    TWC ratified Weinstein's conduct—and found it an acceptable part of his employment, contracting with Weinstein that he could not be fired for it. TWC's Board of Directors approved employment contracts for Weinstein for the periods 2005 to 2010 and 2010 to 2015; those contracts provided that Weinstein could only be terminated for two types of offenses. The first was a conviction for a felony involving "moral turpitude."  The second was a major misuse of TWC funds, although Weinstein had a cure period.[71]

---

[67] *Id.*

[68] Kantor & Twohey, *supra* note 1.

[69] Claudia Eller, *Abrupt Departure by Gill Surprises Many at Miramax*, LOS ANGELES TIMES (Oct. 16, 2002), http://articles.latimes.com/2002/oct/16/business/fi-gill16.

[70] Kantor & Twohey, *supra* note 1.

[71] Tully, *supra* note 7.

156.    Director Maerov took the lead in negotiating Weinstein's 2015 contract. According to Maerov, his chief concern was whether Weinstein's behavior posed a threat of legal liability for the business.[72]

157.    As to sexual assault, according to Director Maerov: "He had to be *convicted* of a felony, and not just any felony, only one involving moral turpitude.  If we'd had documentary evidence of sexual harassment, the absurdity of his old contract still would have prevented us from terminating him." [73]

158.    During the negotiations to renew Weinstein's contract in 2015, Maerov requested to see Weinstein's personnel file, thus indicating that the Board had knowledge of Weinstein's misconduct. Law Firm Participant Boies not only withheld Weinstein's file but also tried to cover up Weinstein's pattern and practice of sexual assault. Nonetheless, he confirmed that settlements to women had been paid.  Boies has indicated that Weinstein's file was subsequently turned over to the Board, which "has not identified anything in it of which the Board was not aware in 2015." [74]

159.    Boies also said, in a letter to the *Financial Times* on October 24, 2017, that the assertion "that Messrs. Maerov and Ben Ammar did not know about Mr. Weinstein's settlements with women when they approved his 2015 contract… is simply false." [75]

---

[72] Megan Twohey, *Weinstein Company Was Aware of Payouts in 2015* , N.Y. TIMES (Oct. 11, 2017), https://www.nytimes.com/2017/10/11/business/weinstein-company.html

[73] Tully, *supra* note 7.

[74] *Id*.

[75] *Id.*

160.    According to TMZ.com, which reportedly obtained a copy of Weinstein's 2015 employment contract, Weinstein and TWC agreed that "if he gets sued for sexual harassment or any other 'misconduct' that results in a settlement or judgment against TWC, all Weinstein has to do is pay what the company's out, along with a fine, and he's in the clear."[76]

161.    Allegedly, the contract provides that, if Weinstein "'treated someone improperly in violation of the company's Code of Conduct,' he must reimburse TWC for settlements or judgments. Additionally, 'You [Weinstein] will pay the company liquidated damages of $250,000 for the first such instance, $500,000 for the second such instance, $750,000 for the third such instance, and $1,000,000 for each additional instance.'"[77]  The Code of Conduct, adopted in September 2015, provides for standard violations such as "sexual harassment," "intimidating or threatening behavior," and receiving "a personal benefit as a result of the employee's position with TWC." [78] Weinstein and TWC further agreed that Weinstein's payment "constitutes a 'cure' for the misconduct and no further action can be taken."[79]

162.    These provisions in an employment contract are unique—and reflect TWC's knowledge that Weinstein had in the past engaged in, and therefore was more likely than not to engage in, sexual harassment and other misconduct affecting the Class and female employees.

---

[76] TMZ, *Contract with TWC ALLOWED FOR SEXUAL HARASSMENT* (Oct. 12, 2017), https://www.tmz.com/2017/10/12/weinstein-contract-the-weinstein-company-sexual-harassment-firing-illegal/.

[77] *Id.*

[78] Tully, *supra* note 7.

[79] TMZ, *supra* note 76.

163.    TWC and Miramax are liable for Weinstein's conduct, because it was perpetuated within the scope of his employment, and even permitted Weinstein a "cure" if he persisted on that course of conduct.

164.    Miramax and TWC's executives, officers, and employees had actual knowledge of Weinstein's repeated acts of sexual misconduct with women. In particular, Defendants were aware of Weinstein's pattern of using his power to coerce and force young women to engage in sexual acts with him. This knowledge was possessed by Miramax, TWC, and TWC's Board of Directors. And Disney and Disney Enterprises knew or should have known of Weinstein's conduct.

165.    Defendants were aware of allegations of sexual misconduct against Weinstein going back to the 1990s.

166.    Mira Sorvino, who was harassed by Weinstein, told a Miramax female employee about the harassment. Rather than shock and horror at Weinstein's action, the employee's reaction "was shock and horror that I had mentioned it."[80]

167.    Kathy DeClesis, Bob Weinstein's assistant in the early 1990s at Miramax stated to *The New York Times*: "It [Weinstein's harassment of women] wasn't a secret to the inner circle."[81]

168.    Weinstein's 2015 employment contract with TWC also reflects that these acts of sexual harassment did or were highly likely to occur within the scope of his employment, providing contingency payments to cover the business expenses associated with such occurrences.

---

[80] Farrow, *supra* note 10.

[81] Kantor & Twohey, *supra* note 1.

**E.      The Weinstein Sexual Enterprise or "Army of Spies"**

**1.      The common purpose of the enterprise was to harass and mislead Class members and the media to prevent the victims from reporting Weinstein's sexual misconduct and to destroy evidence.**

169.    Throughout the Class Period, the Weinstein Sexual Enterprise had the common purpose of preventing (or attempting to prevent) the reporting, prosecution, or disclosure of Weinstein's sexual misconduct through harassment, threats, extortion, and misrepresentations to Weinstein's victims and the media.

170.    The Weinstein Sexual Enterprise also shared the common purpose of destroying, mutilating, or concealing records, documents, or other evidence to prevent the use of such evidence to report, prosecute, and/or publicize Weinstein's sexual offenses, including, but not limited to, the execution of non-disclosure agreements intended to cover up, squelch, and maintain the veil of secrecy around Weinstein's offenses, with threat of legal proceedings or financial duress if the victims were to disclose their experiences.

**2.      Each member of the enterprise played a role in directing and participating in the Weinstein Sexual Enterprise.**

171.    The Weinstein Participants determined the members of the Weinstein Sexual Enterprise and assigned each member of the enterprise a task or tasks to fulfill the common purpose of using false pretenses to prevent the publication or reporting of Weinstein's sexual misconduct and to destroy evidence. Weinstein personally monitored the progress of the investigations.

172.    Miramax and TWC had a business relationship after the Weinstein brothers left Miramax in 2005. For example, Miramax and TWC co-produced Project Runway, and worked together to produce and distribute multiple films including but not limited to: *Proof* (2005), *Derailed* (2005), *The Brothers Grimm* (2005), *Scary Movie 4* (2006), *Breaking and Entering*

- 50 -

(2006), *Scream 4* (2011), *Sin City: A Dame to Kill For* (2014), and *Bad Santa 2* (2016). In 2013, Miramax and TWC entered into a production and distribution deal that gave TWC rights to co-produce sequels to Miramax titles.[82] In a joint announcement, Miramax and TWC said they would make films and TV shows based on Miramax's library of more than 700 films that include *Shakespeare in Love*, *Good Will Hunting*, and *The English Patient*.[83]

173.    Thus, throughout the Class Period, the Complicit Producers—TWC and Miramax—each allowed Weinstein to conduct business at their offices, were aware of his misconduct and agreed to conceal it so that they could continue to benefit from their lucrative collaborations with Weinstein.

174.    The Intelligence Participants targeted dozens of Class members and reporters, using false names and identities to gather information from them regarding Weinstein's sexual offenses, illegally recording conversations, and compiling psychological profiles that focused on the Class members' personal or sexual histories that could be used to extort those individuals' silence. The Intelligence Participants also destroyed or concealed evidence, including but not limited to documents and recordings.

175.    The Film Participants collected names of Class members and reporters with information concerning Weinstein's sexual offenses and placed calls to the Class members and reporters to intimidate them and prevent them from reporting Weinstein's sexual misconduct.

---

[82] David McNary, *Weinsteins Reunite with Miramax in Production, Distribution Deal*, VARIETY (Dec. 16, 2013), http://variety.com/2013/film/news/weinsteins-reunite-with-miramax-in-production-distribution-deal-1200962849/

[83] *Weinstein brothers reunite with Miramax film studio they started*, REUTERS (Dec. 16, 2013), https://www.reuters.com/article/us-miramax-weinsteins/weinstein-brothers-reunite-with-miramax-film-studio-they-started-idUSBRE9BF1A320131216

176.     The Law Firm Participants provided cover and shield to the Weinstein

Participants by contracting with the Intelligence Participants on behalf of the Weinstein

Participants and permitting the Weinstein Participants to protect evidence of Weinstein's

misconduct under the guise of the attorney-client privilege or the doctrine of attorney work

product when that was not the case. The Law Firm Participants also approved the Intelligence

Participants' "operational methodologies," which were illegal.

177.     Certain Law Firm Participants, including Brafman, targeted Class members and

deceived them into believing that they intended to represent the Class members and a class of

victims. Under that deception, the Law Firm Participants gathered information from the Class

members regarding Weinstein's sexual offenses, as well as other information that could then be

used against the Class members or to extort those individuals' silence.

178.     The Journalist Participants also gathered information from Weinstein's victims

regarding Weinstein's sexual offenses under the pretense of writing a story, illegally recorded

conversations, and compiled profiles that focused on their personal or sexual histories that could

be used to extort those individuals' silence.

**3.      The Weinstein Sexual Enterprise engaged in a pattern of racketeering
         activity.**

179.     As an example of how the Enterprise worked, in 2016 and 2017, Weinstein

learned that several reporters were talking to Class members regarding their allegations of rape,

battery, and assault by Weinstein.

180.     Weinstein directed the Law Firm Participant Boies Schiller to retain Intelligence

Participant Black Cube to investigate which Class members were providing information, to

gather intelligence to prevent the reporting or publication of the accusations, and to secretly record Class members' conversations.[84]

181.    In October 2016, Boies Schiller and Black Cube signed a contract to help the Weinstein Sexual Enterprise. They also signed several subsequent contracts for the same purposes. On or about October 28, 2016, Boies Schiller wired Black Cube an initial payment of $100,000 to fulfill those purposes. [85]

182.    Rose McGowan intended to publish a book detailing how Weinstein raped her in 1997. Weinstein directed Boies Schiller to retain Black Cube to prevent the reporting of the rape, [86] and Black Cube agreed to do so.

183.    Boies Schiller did retain Black Cube pursuant to a contract dated July 11, 2017, providing that the project's "primary objectives" are to "provide intelligence which will help the Client's efforts to completely stop the publication of a new negative article in a leading NY newspaper" and to "obtain additional content of a book which currently being written and includes harmful negative information on and about the Client," who allegedly is identified as Weinstein in multiple documents obtained by *The New Yorker*. [87]

184.    The July 11, 2017 contract included several "success fees" if Black Cube met its goals, including $300,000 if the agency "provide[d] intelligence which will directly contribute to the efforts to completely stop the Article from being published at all in any shape or form" and

---

[84] Farrow, *supra* note 4.

[85] *Id.*

[86] *Id.*

[87] *Id.*

$50,000 if it secured "the other half" of McGowan's book "in readable book and legally admissible format." [88]

185.    The contract between Boies Schiller and Black Cube included a description of the duplicitous tactics to be used to accomplish the objectives of the Weinstein Sexual Enterprise. [89]

186.    Black Cube agreed to provide "a dedicated team of expert intelligence officers that will operate in the USA and any other necessary country," including a project manager, intelligence analysts, linguists, and "Avatar Operators" specifically hired to create fake identities on social media, along with "operations experts with extensive experience in social engineering." The agency also said that it would provide "a full time agent by the name of 'Anna' (hereinafter 'the Agent'), who will be based in New York and Los Angeles as per the Client's instructions and who will be available full time to assist the Client and his attorneys for the next four months." According to *The New Yorker*, four sources with knowledge of Weinstein's work with Black Cube confirmed that this was the same woman who would meet with McGowan and Ben Wallace, a reporter from New York who was working on a story about Weinstein, under false pretenses. [90]

187.    Black Cube also agreed to hire "an investigative journalist, as per the Client request," who would be required to conduct ten interviews a month for four months and be paid forty thousand dollars. Black Cube agreed to "promptly report to the Client the results of such interviews by the Journalist." [91]

---

[88] *Id.*

[89] *Id.*

[90] *Id.*

[91] *Id.*

188.    Black Cube did fulfill its contract with Boies in furtherance of the Weinstein Sexual Enterprise's objectives. In May 2017, Rose McGowan received an e-mail from a literary agency introducing her to a woman who identified herself as Diana Filip, the deputy head of sustainable and responsible investments at Reuben Capital Partners, a London-based wealth-management firm. In reality, Filip was an employee of Black Cube, which had developed the fictional Reuben Capital Partners. According to *The New Yorker*, "Diana Filip" was an alias for a former officer in the Israeli Defense Forces who originally hailed from Eastern Europe. [92]

189.    Duplicitously claiming in an email that she was launching an initiative to combat discrimination against women in the workplace, Filip asked McGowan to speak at a gala kickoff event for a fee of sixty thousand dollars. Using false pretenses, Filip met with McGowan on at least four occasions, including at the Peninsula Hotel in Beverly Hills, in hotel bars in Los Angeles and New York, and on the Venice boardwalk.  Filip repeatedly told McGowan that she wanted to make a significant investment in McGowan's production company. The purpose of these meetings, which were secretly recorded by Intelligence Participant Black Cube, was to extract information regarding Weinstein and to prevent the publication of McGowan's book and/or the reporting of accusations against Weinstein. [93]

190.    At one meeting in September 2017, Filip was joined by another Black Cube operative, who used the name Paul and claimed to be Filip's colleague at Reuben Capital

---

[92] *Id.*

[93] *Id.*

Partners. The purpose of the meeting was to pass McGowan to another operative to extract more information.[94]

191.    Black Cube used information extracted from McGowan regarding McGowan's reporting of the rape to a reporter at *The New Yorker* to contact the reporter in an attempt to prevent the publication of the accusation. [95]

192.    In 2016, Black Cube's Filip used a second alias, "Anna," to meet twice with Ben Wallace, suggesting she had an allegation against Weinstein. However, Anna never shared information, but instead pushed the reporter for information about what he knew and who he was talking to.  During their second meeting, Anna requested that they sit close together, leading Wallace to suspect that she was secretly recording their conversation. [96]

193.    Filip also allegedly used her alias to email Jodi Kantor, a reporter for *The New York Times*, regarding a story about Weinstein. [97]

194.    Black Cube also retained a freelance journalist to further the objectives of the Weinstein Sexual Enterprise, providing the journalist with contact information for victims, journalists, and Weinstein's business rivals. The freelancer conducted interviews to be used by the Weinstein Sexual Enterprise and provided summaries of those interviews to Black Cube, which then sent the summaries to one or more Law Firm Participants, including Boies Schiller. [98]

---

[94] *Id.*

[95] *Id.*

[96] *Id.*

[97] *Id.*

[98] *Id.*

195.    In January 2017, the freelance journalist called McGowan and secretly recorded their lengthy conversation. He also contacted other Class members (including actress Annabella Sciorra and, on information and belief, Katherine Kendall), Ben Wallace, Ronan Farrow (*The New Yorker*) in furtherance of the objectives of the enterprise. [99]

196.    Weinstein also enlisted Dylan Howard, the chief content officer of American Media Inc., which publishes the *National Enquirer*, to have his reporters obtain information that would discredit McGowan.  Howard obtained secret recordings of those interviews from his reporters and shared them with Weinstein to be used to discredit victims of Weinstein's sexual offenses. [100]

197.    Kroll's participation in the Weinstein Sexual Enterprise included the destruction of evidence.  After Ambra Battilana Gutierrez, an Italian model, accused Weinstein of sexually assaulting her in 2015, Weinstein required her to surrender all her personal devices to Kroll so that evidence of a conversation in which Weinstein admitted to groping her could be deleted. [101]

198.    E-mails obtained by *The New Yorker* also purportedly show that Dan Karson, the chairman of Kroll America's Investigations and Disputes practice, contacted Weinstein at his personal e-mail address with information intended to discredit Class members.[102]

199.    Other unidentified Intelligence Participants prepared similar reports. One such profile targeted Rosanna Arquette, an actress who later, in *The New Yorker*, accused Weinstein

---

[99] *Id.*

[100] *Id.*

[101] *Id.*

[102] *Id.*

of sexual harassment. The file mentions Arquette's friendship with McGowan, Arquette's social-media posts about sexual abuse, and the fact that a family member had gone public with an allegation that Arquette had been molested as a child. [103] According to a report by *Vanity Fair*, on or about October 3, 2017, Weinstein and a handful of TWC staffers summoned an IT specialist to try to delete a document called "HW friends" from local workstations and the TWC corporate servers in anticipation of reporting on and litigation about Weinstein's sexual misconduct. The document contained a list of 63 women broken down by their locations.[104]

200.    In or about October 2017, Weinstein also, on information and belief, directed Law Firm Participant Brafman & Associates to obtain evidence victims had of his wrongdoing, including from Plaintiff Melissa Thompson, using deceptive tactics.

201.    With at least three different victims, Weinstein and/or an attorney from Brafman sought the assistance of Ambassador Paolo Zampolli, a mutual acquaintance of the women. Zampolli contacted each of the women via telephone, including Plaintiff Melissa Thompson (calling her in Connecticut from New York on October 13, 2017), to persuade them to contact Brafman's office under the guise that Brafman was representing several female victims against Weinstein and would represent them.

202.    Zampolli then put Thompson in touch, via email, with Brafman's partner, Alex Spiro. Over the course of several days, under the guise he was evaluating her claim for the purpose of representing her, Spiro sought details of Weinstein's assault of Thompson as well as copies of her physical evidence—which she shared for the purpose of seeking legal advice.

---

[103] *Id.*

[104] Adam Ciralsky, *"Harvey's Concern Was Who Did Him In": Inside Harvey Weinstein's Frantic Final Days*, VANITY FAIR (Jan. 2018), https://www.vanityfair.com/hollywood/2018/01/harveys-concern-was-who-did-him-in-inside-harvey-weinstein-frantic-final-days.

Thompson and Spiro also discussed, orally and in writing, strategies to prosecute victims' claims against Weinstein, as well as "loopholes" to the statute of limitations applicable to Thompson's claim.

203.    Thompson learned from the media, two weeks later, that Brafman in fact represented Weinstein and had been on Weintein's team "for awhile." Neither Brafman nor Spiro ever terminated their relationship with Thompson nor disclosed the conflict of interest in violation of ethical rules—but rather purposefully directed the fraud in furtherance of a pattern of racketeering.

204.    Since that time, Brafman has made numerous statements in the media reflecting that his investigation on Weinstein's behalf encompassed victims in both the TWC and Miramax Subclasses, including that: "there was zero discrimination at either Miramax or TWC."[105] During the course of the TWC bankruptcy, Weinstein, using a declaration of Brafman, requested the emails he exchanged with unnamed victims in order to "exonerate" himself from criminal charges.[106] But neither he nor TWC has agreed that those same communications should be available to the victims.

**F.    The statute of limitations is tolled based on the continuing violations doctrine, equitable estoppel, and the duress pursuant to which Weinstein threatened the Class if they complained.**

205.    The power Weinstein wielded—and his ability to blacklist an actress or model for complaining about his predatory behavior—was so legendary that it was the rule in the

---

[105] Gene Maddaus, *Weinstein Responds to Lawsuit, Says He Feels Like a 'Scapegoat'*, VARIETY (Feb. 11, 2018), http://variety.com/2018/biz/news/harvey-weinstein-hollywood-schneiderman-1202694837/.

[106] Harvey Weinstein's Mot. Entry of an Order Compelling Ltd. Discovery Under Rule 2004 of Fed. R. Bankr. P., *In re: Weinstein Co. Holdings, LLC*, 18-10601 (MFW) (Bankr. D. Del. Apr. 20, 2018).

entertainment industry that women needed to acquiesce to Weinstein to succeed. This rule was so widely accepted that male producers and actors laughingly voiced their expectations that Plaintiff and the Class had and would follow it to further their careers. For example, at the 2013 Academy Awards ceremony, Seth MacFarlane, the creator of *Family Guy*, was onstage to announce the five nominees for best supporting actress when he stated: "Congratulations, you five ladies no longer have to pretend to be attracted to Harvey Weinstein."[107]

206.    If women did not accede to his demands, "Weinstein and his associates used nondisclosure agreements, payoffs, and legal threats to suppress their accounts."[108] This uniform response to those who challenged Weinstein's behavior, which was widely known throughout the industry, actually and reasonably placed Class members under duress and induced them to forebear asserting their legal rights in response to Weinstein's actions.

207.    For example, Asia Argento, an Italian film actress and director, said that she did not speak out until 2017, after Weinstein had "forcibly performed oral sex on her" years before, "because she feared that Weinstein would 'crush' her. 'I know he has crushed a lot of people before… That's why this story—in my case, it's twenty years old, some of them are older—has never come out.'"[109]

208.    Four actresses, including Mira Sorvino and Rosanna Arquette, told *The New Yorker* that "they suspected that, after they rejected Weinstein's advances or complained about them to company representatives, Weinstein had them removed from projects or dissuaded

---

[107] James Hibberd, *Seth MacFarlane explains his Harvey Weinstein joke in emotional post*, ENTERTAINMENT WEEKLY (Oct. 11, 2017), http://ew.com/tv/2017/10/11/seth-macfarlane-harvey-weinstein-jessica-barth/.

[108] Farrow, *supra* note 10.

[109] *Id.*

people from hiring them." Multiple sources told the same reporter that "Weinstein frequently bragged about planting items in media outlets about those who spoke against him; these sources feared similar retribution."

209.   Weinstein and his companies worked to blacklist women who had refused sexual advances. In or about 1998, Mira Sorvino and Ashley Judd had been chosen to star in the *Lord of the Rings*, when the franchise was still under the umbrella of Miramax. Peter Jackson, the films' director, confirmed that Miramax stepped in and told him that Judd and Sorvino were "a nightmare to work with and we should avoid them at all costs."[110]

210.   Several sources "pointed to Gutierrez's case: after she went to the police, negative items discussing her sexual history and impugning her credibility began rapidly appearing in New York gossip pages. (In the taped conversation, part of which *The New Yorker* posted online, Weinstein asks Gutierrez to join him for "five minutes," and warns, "Don't ruin your friendship with me for five minutes.")[111]

211.   Women who spoke to *The New Yorker* on condition of anonymity "were too afraid to allow me to use their names, but their stories are uncannily similar to these allegations. One, a woman who worked with Weinstein, explained her reluctance to be identified. 'He drags your name through the mud, and he'll come after you hard with his legal team.'"[112]

---

[110] Nardine Saad, *Peter Jackson says Weinsteins blacklisted Ashley Judd, Mira Sorvino; Harvey Weinstein disagrees*, LOS ANGELES TIMES (Dec. 15, 2017), http://www.latimes.com/entertainment/la-et-entertainment-news-updates-peter-jackson-ashley-judd-mira-sorvino-weinstein-1513362464-htmlstory.html.

[111] Farrow, *supra* note 10.

[112] *Id.*

212.   Mira Sorvino, who rejected Weinstein's advances and complained about his harassment to Miramax, "felt that saying no to Weinstein and reporting the harassment had ultimately hurt her career." She told a reporter from *The New Yorker*, "…I definitely felt iced out and that my rejection of Harvey had something to do with it."[113]

213.   After Gwyneth Paltrow was harassed, she complained to her then-boyfriend Brad Pitt, who confronted Weinstein, who subsequently called and berated Paltrow for disclosing what happened. Paltrow feared she would be fired from the Miramax film *Emma* if she complained further.[114]

214.   After Judith Godrèche complained to a female producer at Miramax about Weinstein's harassment, she was told not to say anything so as not to endanger the release of the Miramax films in which she appeared.[115]

215.   Darryl Hannah felt immediate repercussions from turning down Weinstein's advances and sexual demands. A Miramax plane on a film tour left without her, her plane and hotel reservations were cancelled, and her hair and make-up artist was let go.[116]  Hannah was not about to let Weinstein's actions go, however—she complained to her manager, a producer on the film, and her director, Quentin Tarantino, who has since admitted that he did nothing.[117]

---

[113] *Id.*

[114] Kantor & Abrams, *supra* note 13.

[115] *Id.*

[116] Farrow, *supra* note 52.

[117] *Id.*

Nonetheless, Hannah not only was not believed but also, consistent with the objectives of the Weinstein Sexual Enterprise, was "berated, criticized, and blamed."[118]

216.     Moreover, "Weinstein enforced a code of silence; employees of the Weinstein Company have contracts saying they will not criticize it or its leaders in a way that could harm its 'business reputation' or 'any employee's personal reputation,' a recent document shows."[119]

217.     Shortly before *The New York Times* and *The New Yorker* finally revealed the decades-long pattern of harassment, Weinstein and his legal team began calling Class members, threatening them for talking. They also threatened to sue *The New York Times* and other media outlets.[120]

218.     When Melissa Thompson expressed concern about the statute of limitations, Alex Spiro, who was acting as Thompson's attorney at the time, told her that there are "loopholes" around it. Unbeknownst to Thompson, Spiro's firm, Brafman & Associates, was contemporaneously representing Harvey Weinstein. By reassuring Thompson about the statute of limitations, Spiro took affirmative steps designed to induce Thompson, by deception and misrepresentations, to refrain from filing suit.

219.     The type of emotional and physical abuse Weinstein used to command silence from his victims and cover up his assaults has been studied by psychologists. Psychologists John Gottman and Neil Jacobsen, authors of *When Men Batter Women* (first published in 1998 and reissued in 2007), extensively researched emotional abuse and domestic violence and created a 27-question survey designed to help doctors establish whether patients were suffering from

---

[118] *Id.*

[119] Kantor & Twohey, *supra* note 1.

[120] Farrow, *supra* note 10.

systematic abuse at the hands of a partner. The four factors that determine emotional violence,

Gottman and Jacobson concluded, were isolation, degradation, sexual abuse, and property

damage.  Each of these factors can be found in Weinstein's abuse of Plaintiffs and the Class.

220.    The statute of limitations was thus tolled at least until *The New York Times*

published a powerful report revealing allegations of sexual harassment against Weinstein, which

led to the resignation of four members of TWC's Board and to the firing of Weinstein.

221.    According to TWC Board Member Maerov, it was not until TWC fired Weinstein

and took away his power in the industry that Weinstein's victims felt comfortable enough to

complain.  Maerov stated: "Once he was out, the women he'd abused knew there was no way he

could harm them professionally.  Firing him was crucial to opening the floodgates."[121]

## V.    CLASS ALLEGATIONS

222.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(b)(2)

and 23(c)(4) on behalf of themselves and the following "Nationwide Class":

> All women who met with Harvey Weinstein in person (i) to
> audition for or to discuss involvement in a project to be produced
> or distributed by either The Weinstein Company Holdings, LLC
> or, prior to September 30, 2005, Miramax Film Corp., or (ii) in a
> meeting or event facilitated, hosted, or underwritten by TWC or,
> prior to September 30, 2005, Miramax Film Corp.

223.    In addition, Plaintiffs Caitlin Dulany and Larissa Gomes assert certain state law

claims on behalf of the "Miramax Subclass," defined as:

> All women who met with Harvey Weinstein in person, before
> September 30, 2005, (i) to audition for or to discuss involvement in
> a project to be produced or distributed by Miramax Film Corp. or
> (ii) in a meeting or event facilitated, hosted, or underwritten by
> Miramax Film Corp.

---

[121] Tully, *supra* note 7.

224.    Plaintiff Melissa Thompson also asserts certain state law claims on behalf of the

"TWC Subclass," defined as:

> All women who met with Harvey Weinstein in person (i) to
> audition for or to discuss involvement in a project to be produced
> or distributed by The Weinstein Company Holdings, LLC, or (ii) in
> a meeting or event facilitated, hosted, or underwritten by The
> Weinstein Company Holdings, LLC.

The Nationwide Class, Miramax Subclass, and TWC Subclass are hereinafter referred to as the

"Classes."

225.    The Classes consist of dozens, if not hundreds, of women, making joinder

impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the Class and the

identities of the individual members are ascertainable through records maintained by Weinstein,

the Complicit Producers, and members of the Weinstein Sexual Enterprise. For example, one

former employee of the Complicit Producers told *The New Yorker* that "she was asked to keep

track of the women, who, in keeping with a practice established by Weinstein's assistants, were

all filed under the same label in her phone: F.O.H., which stood for 'Friend of Harvey.'"[122]

226.    The claims of Plaintiffs are typical of the Class and the respective Subclasses. The

claims of the Plaintiffs and the Classes are based on the same legal theories and arise from the

same unlawful pattern and practice of sexual harassment and assault.

227.    There are many questions of law and fact common to the claims of Plaintiffs and

the Classes, and those questions predominate over any questions that may affect only individual

Class members within the meaning of Fed. R. Civ. P. 23(a)(2) and (c)(4).

---

[122] Farrow, *supra* note 10.

228.    Common questions of fact and law affecting members of the Classes include, but are not limited to, the following:

a.    Whether RICO Defendants engaged in a scheme with the Intelligence Participants, Law Firm Participants, Journalist Participants and others to use false pretenses to tamper with victims and witnesses of Weinstein's sexual misconduct in order to prevent the publication, prosecution, or reporting of Weinstein's sexual misconduct, and to destroy evidence.

b.    Whether RICO Defendants violated RICO, 18 U.S.C. § 1962.

c.    Whether RICO Defendants violated RICO, 18 U.S.C. § 1512.

d.    Whether Weinstein engaged in a pattern and practice of sexual harassment, assault, and battery.

e.    Whether Weinstein's pattern and practice of sexual harassment, assault, and battery was committed within the scope of his employment at Miramax or TWC.

f.    Whether TWC, TWC's Board, Miramax, Disney, or Disney Enterprises knew or should have known of Weinstein's pattern and practice of sexual harassment, assault, and battery.

g.    Whether TWC, TWC's Board, or Miramax facilitated Weinstein's pattern and practice of sexual harassment, assault, and battery.

h.    Whether TWC, TWC's Board, or Miramax ratified Weinstein's pattern and practice of sexual harassment, assault, and battery.

i.    Whether Weinstein, TWC, TWC's Board, or Miramax engaged in conduct designed to suppress complaints or reports regarding Weinstein's conduct.

010717-11 1031668 V3

j.      Whether Miramax, Disney, Disney Enterprises, TWC or TWC's Board

negligently retained or supervised Weinstein.

k.      Whether Miramax and/or TWC are responsible for Weinstein's conduct

under the doctrine of *respondeat superior*.

229.     Absent a class action, most of the members of the Classes would find the cost of

litigating their claims to be prohibitive and would have no effective remedy. The class treatment

of common questions of law and fact is also superior to multiple individual actions or piecemeal

litigation, particularly as to TWC, Disney, Disney Enterprises, and Miramax's legal

responsibility for Weinstein's actions, in that it conserves the resources of the courts and the

litigants and promotes the consistency and efficiency of adjudication.

230.     Plaintiffs will fairly and adequately represent and protect the interests of the

Classes. Plaintiffs have retained counsel with substantial experience in prosecuting complex

litigation and class actions. Plaintiffs and their counsel are committed to vigorously prosecuting

this action on behalf of the other Class members, and have the financial resources to do so.

Neither Plaintiffs nor their counsel have any interests adverse to those of the other members of

the Classes.

## VI.     CAUSES OF ACTION

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(C)
### (PLAINTIFFS VERSUS ALL RICO DEFENDANTS)

231.     Plaintiffs incorporate by reference all preceding paragraphs, as if fully set forth

herein.  Plaintiffs assert Count I on behalf of the Nationwide Class.

232.     RICO Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who

conducted the affairs of the enterprise through a pattern of racketeering activity in violation of

18 U.S.C. § 1962(c).

- 67 -

233. The Weinstein Sexual Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) RICO Defendants, including their employees and agents; (ii) the Weinstein Participants; (iii) the Intelligence Participants; (iv) the Firm Participants; (v) the Journalist Participants; (v) the Film Participants, and other unnamed co-conspirators as set forth *supra*. The Weinstein Sexual Enterprise is an ongoing organization that functions as a continuing unit. The Weinstein Sexual Enterprise was created and used as a tool to effectuate RICO Defendants' pattern of racketeering activity. The Defendant "persons" are distinct from the Weinstein Sexual Enterprise.

234. The Weinstein Sexual Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of: (i) harassing, threatening, extorting, and misleading Weinstein's victims and the media to prevent the reporting, disclosure, or prosecution of his sexual misconduct, and (ii) destroying, mutilating, or concealing records, documents, or other evidence to prevent the use of such evidence to report (or prosecute) his sexual offenses.

235. RICO Defendants have conducted and participated in the affairs of the Weinstein Sexual Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), which includes multiple instances of tampering with a witness or victim in violation of 18 U.S.C. § 1512, and multiple instances of obtaining a victim for the purpose of committing or attempting to commit aggravated sexual abuse in violation of 18 U.S.C. §§ 1590 and 1591 as described above. The pattern of racketeering activity also included multiple instances of mail and wire fraud as described below.

236. The Weinstein Sexual Enterprise engaged in and affected interstate commerce, because, *inter alia*, Weinstein, TWC, and Miramax contracted with multinational corporations

not only for movie and television productions but also for the investigation, slander, blacklisting, and blackmail of Weinstein's victims.

237.    RICO Defendants exerted control over the Weinstein Sexual Enterprise, and RICO Defendants participated in the operation or management of the affairs of the Weinstein Sexual Enterprise.

238.    Within the Weinstein Sexual Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The Weinstein Sexual Enterprise used this common communication network for the purpose of enabling Weinstein's sexual activities.

239.    Each participant in the Weinstein Sexual Enterprise had a systematic linkage to each other participant through corporate ties, contractual relationships, financial ties, and the continuing coordination of their activities. Through the Weinstein Sexual Enterprise, the RICO Defendants and their co-conspirators functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purposes.

240.    The RICO Defendants used the mails and wires for the transmission, delivery, or shipment of the following by the RICO Defendants or third parties that were foreseeably caused to be sent as a result of RICO Defendants' illegal scheme:

(a)    Contracts between Weinstein and the Law Firms and Intelligence Participants;

(b)    Wires among the Complicit Producers about Weinstein's sexual misconduct;

- 69 -

(c)     Wires and mails between the Law Firms and the Intelligence Participants on the subject of Weinstein's sexual activities, his victims, and concealing his acts of sexual misconduct;

(d)     Payments to the Law Firm Participants and Intelligence Participants to perform their roles in concealing Weinstein's sexual misconduct;

(e)     Emails from the Law Firm Participants to lawyers retained by Class members to encourage confidentiality in connection with accusations of sexual misconduct by Weinstein;

(f)     Emails, texts, and telephone calls from the Law Firm Participants to Class members in connection with inquiries or meetings designed to elicit information from Class members using deception;

(g)     Emails from the Intelligence Participants to Class members in connection with inquiries or meetings designed to elicit information from Class members using deception;

(h)     Use of the wires by the Intelligence Participants to construct false identities and websites to deceive Class members and journalists.

241.    The RICO Defendants utilized the interstate and mail and wires for the purpose of obtaining money or property by means of the omissions, false pretenses, and misrepresentations described therein.

242.    The RICO Defendants also used the Internet and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities.

243.    The RICO Defendants also communicated by U.S. Mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, and other third-party entities in furtherance of the scheme.

- 70 -

244.    The mail and wire transmissions described herein were made in furtherance of the RICO Defendants' scheme and common course of conduct to deceive the public about Weinstein's sexual activities.

245.    To achieve their common goals, the RICO Defendants hid from the general public the unlawfulness of Weinstein's conduct, and suppressed and/or ignored warnings from third parties about his conduct.

246.    Defendants' scheme and the above-described racketeering activities amounted to a common course of conduct intended to cause Plaintiffs and others to hide and conceal Weinstein's conduct.  Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs.  RICO Defendants' fraudulent activities are part of their ongoing business and constitute a continuing threat to Plaintiffs' property.

247.    The pattern of racketeering activity alleged herein and Weinstein are separate and distinct from each other.  RICO Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the Weinstein Sexual Enterprise.

248.    Plaintiffs have been injured in their property and business by reason of these violations.  RICO Defendants interfered with Plaintiffs' current and prospective contractual relations, because Plaintiffs lost employment and employment opportunities, as well contracts and contractual opportunities, as a result of Weinstein's conduct.

249.    Had members of the Weinstein Sexual Enterprise not been complicit and had they revealed instead of concealed Weinstein's predatory behavior, Plaintiffs and members of the Class would not have been injured.  Thus, Plaintiffs' injuries were directly and proximately caused by RICO Defendants' racketeering activity, as described above.

- 71 -

250.    By virtue of these violations of 18 U.S.C. § 1962(c), RICO Defendants are liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorneys' fees.

## COUNT II

### VIOLATION OF 18 U.S.C. § 1962(D) BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962(C) (PLAINTIFFS VERSUS ALL RICO DEFENDANTS)

251.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein. Plaintiffs bring this Count II on behalf of the Nationwide Class.

252.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

253.    RICO Defendants have violated section 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the section 1962(c) Enterprise described previously through a pattern of racketeering activity.

254.    As demonstrated in detail above, RICO Defendants' co-conspirators, including, but not limited to, the Weinstein Participants, the Intelligence Participants, the Law Firm Participants, the Film Participants, and the Journalist Participants have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including multiple instances of tampering with a victim or witness in violation of 18 U.S.C. § 1512.

255.    The nature of the above-described RICO Defendants' co-conspirators' acts in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but also were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.  At all relevant times, all RICO Defendants and their co-conspirators were

- 72 -

aware of the essential nature and scope of the Weinstein Sexual Enterprise and intended to participate in it.

256.    As a direct and proximate result of RICO Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiffs have been and are continuing to be injured in their business or property, as set forth more fully above.

257.    RICO Defendants have sought to and have engaged in the violations of the above federal laws and the effects thereof detailed above are continuing and will continue unless injunctive relief prohibiting RICO Defendants' illegal acts constituting a pattern of racketeering activity is fashioned and imposed by the Court.

## COUNT III

### NEGLIGENT SUPERVISION AND RETENTION
### (CAITLIN DULANY AND LARISSA GOMES VERSUS MIRAMAX, DISNEY, DISNEY ENTERPRISES, AND ROBERT WEINSTEIN)

258.    Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein, and bring Count III against Miramax, Disney, Disney Enterprises, and Robert Weinstein on behalf of the Miramax Subclass.

259.    At all times material prior to September 30, 2005, Miramax employed Weinstein and Weinstein was an executive and/or director of Miramax.  Robert Weinstein was also an executive and/or director of Miramax.

260.    In two of Harvey Weinstein's employment agreements with Miramax Film Corp., effective in or about 1993-1995 and 1995-1999, Disney is defined as a "co-obligor" of Miramax Film Corp.  In a 1999 employment agreement between Harvey Weinstein and Miramax, Disney Enterprises is defined as a "co-obligor" of Miramax Film Corp.

261.    Weinstein was unfit or incompetent to work directly with Class members and posed a particular risk of sexually harassing and assaulting them.

262.    Miramax, Disney, Disney Enterprises, and Robert Weinstein knew or should have known not only that Weinstein was unfit or incompetent to work directly with women and posed a particular risk of sexually harassing and assaulting them, but also that this unfitness created a particular risk to Plaintiff and the Class.

263.    Weinstein's unfitness and particular risk to Class members and women in the entertainment industry harmed Plaintiff and the Class.

264.    Miramax, Disney, Disney Enterprises, and Robert Weinstein's negligence in supervising and or retaining Weinstein was a substantial factor in causing harm to Plaintiff and the Class.

**COUNT IV**

**NEGLIGENT SUPERVISION AND RETENTION**
**(MELISSA THOMPSON VERSUS TWC'S BOARD MEMBERS)**

265.    Plaintiff Melissa Thompson restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein, and brings Count IV against TWC's Board of Directors on behalf of the TWC Subclass.

266.    At all times material from September 30, 2005, to October 2017, TWC employed Weinstein and Weinstein was an executive and/or director of TWC.

267.    Weinstein was unfit or incompetent to work directly with Class members and women in the entertainment industry and posed a particular risk of sexually harassing and assaulting them.

268.    TWC and TWC's Board of Directors knew or should have known not only that Weinstein was unfit or incompetent to work directly with Class members and women in the

- 74 -

entertainment industry and posed a particular risk of sexually harassing and assaulting them, but also that this unfitness created a particular risk to Plaintiffs and the Class.

269.    Weinstein's unfitness and particular risk to women in the entertainment industry harmed Plaintiffs and the Class.

270.    TWC and its Board of Directors' negligence in supervising and or retaining Weinstein was a substantial factor in causing harm to Plaintiffs and the Class.

## COUNT V

## CIVIL BATTERY
## (CAITLIN DULANY AND LARISSA GOMES VERSUS MIRAMAX AND WEINSTEIN)

271.    Plaintiffs Caitlin Dulany and Larissa Gomes restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein, and bring this Count V on behalf of the Miramax Subclass.

272.    Weinstein intended to commit an act of unwanted contact and/or caused imminent apprehension of such an act against Plaintiffs and the Class members. He did so by, *inter alia*:

        a.      Isolating Plaintiffs and Class members in closed quarters and dismissing any bystanders; and

        b.      Demanding or threatening sexual contact.

273.    Weinstein did commit an unwanted contact with Plaintiffs and the Class members' person or property in a harmful or offensive manner, including but not limited to causing sexual contact between Weinstein and each Class member.

274.    Weinstein's battery of Plaintiffs and the Class caused harm, including physical, mental, and/or emotional harm to each Class member.

275.    Weinstein's conduct was committed within the scope of his employment at Miramax. A causal nexus existed between (i) Weinstein's grooming of women in the

entertainment industry to work with Miramax and (ii) his abuse of his power to coerce and batter those women.  Each act of battery of a Class member lured with the prospect of being cast in a Miramax production or to meet or work with Miramax and Weinstein was foreseeable given, *inter alia*, the use of Miramax employees to lure the victims and the commission of the acts on Miramax property or at locations paid for by Miramax.

276.    Weinstein's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of Miramax's business. Assaults in the context of the "casting couch" are exactly why female members of the entertainment industry would expect production companies to take extra precautions to ensure that they are protected from abuse by a powerful executive.

277.    Holding Miramax liable furthers the policy goals of *respondeat superior*, including the prevention of future injuries and the assurance of compensation to victims, given that Plaintiffs and the Class members do not have separate remedies under Title VII because they were not employees of Miramax.

**COUNT VI**
**CIVIL BATTERY**
**(MELISSA THOMPSON**
**VERSUS TWC BOARD MEMBERS AND WEINSTEIN)**

278.    Plaintiff Melissa Thompson restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein, and brings this Count VI against TWC Board Members and Weinstein on behalf of the TWC Subclass.

279.    Weinstein intended to commit an act of unwanted contact and/or caused imminent apprehension of such an act against Plaintiffs and the Class members. He did so by, *inter alia*:

        a.    Isolating Plaintiffs and Class members in closed quarters and dismissing any bystanders; and

       b.     Demanding or threatening sexual contact.

280.    Weinstein did commit an unwanted contact with Plaintiffs and the Class members' person or property in a harmful or offensive manner, including, but not limited to, causing sexual contact between Weinstein and each Class member.

281.    Weinstein's battery of Plaintiffs and the Class caused harm, including physical, mental, and/or emotional harm of each Class member.

282.    Weinstein's conduct was committed within the scope of his employment at TWC. A causal nexus existed between (i) Weinstein's grooming of women in the entertainment industry to work with TWC and (ii) his abuse of his power to coerce and batter those women. Each act of battery of a Class member lured with the prospect of being cast in a TWC production or to meet or work with TWC and Weinstein was foreseeable given, *inter alia*, the use of TWC employees to lure the victims and the commission of the acts on TWC property or at locations paid for by TWC.

283.    Weinstein's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of TWC's business. Assaults in the context of the "casting couch" are exactly why female members of the entertainment industry would expect production companies to take extra precautions to ensure that they are protected from abuse by a powerful executive.

284.    Holding TWC Board Members liable furthers the policy goals of *respondeat superior*, including the prevention of future injuries and the assurance of compensation to victims, given that Plaintiffs and the Class members do not have separate remedies under Title VII because they were not employees of TWC.

## COUNT VII

### ASSAULT
### (CAITLIN DULANY AND LARISSA GOMES VERSUS WEINSTEIN AND MIRAMAX)

285.   Plaintiffs Caitlin Dulany and Larissa Gomes restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein, and bring this Count VII against Weinstein and Miramax on behalf of the Miramax Subclass.

286.   Weinstein intended to cause apprehension of harmful or offensive conduct against Plaintiff and the Class members. He did so by, *inter alia*:

    a.   Isolating Plaintiffs and the Class members in closed quarters and dismissing any bystanders;

    b.   Demanding or threatening sexual contact;

    c.   Cornering, chasing, blocking, or otherwise using his heft to cause Plaintiffs and the Class to fear that Weinstein had the ability to carry out his physical threats; and

    d.   Threatening harm to the careers and reputations of Plaintiffs and the Class members if they did not participate in such conduct.

287.   Weinstein's actions did, in fact, cause Plaintiffs and the Class members to fear imminent harmful or offensive contact by Weinstein.

288.   Weinstein's conduct was committed within the scope of his employment at Miramax. A causal nexus existed between (i) Weinstein's grooming of women in the entertainment industry to work with Miramax and (ii) his abuse of his power to coerce and batter those women.  Each act of battery of a Class member lured with the prospect of being cast in a Miramax production or to meet or work with Miramax and Weinstein was foreseeable given,

- 78 -

*inter alia*, the use of Miramax employees to lure the victims and the commission of the acts on Miramax property or at locations paid for by Miramax.

289.    Weinstein's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of Miramax's business. Assaults in the context of the "casting couch" are exactly why female members of the entertainment industry would expect production companies to take extra precautions to ensure that they are protected from abuse by a powerful executive.

290.    Holding Miramax liable advances the policy goals of *respondeat superior*, including the prevention of future injuries and the assurance of compensation to victims, given that Plaintiff and the Class members do not have separate remedies under Title VII because they were not employees of Miramax.

**COUNT VIII**

**ASSAULT**
**(MELISSA THOMPSON**
**VERSUS WEINSTEIN AND TWC BOARD MEMBERS)**

291.    Plaintiff Melissa Thompson restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein, and brings this Count VIII against Weinstein and TWC Board Members on behalf of the TWC Subclass.

292.    Weinstein intended to cause apprehension of harmful or offensive conduct against Plaintiffs and the Class members. He did so by, *inter alia*:

       a.   Isolating Plaintiffs and the Class members in closed quarters and dismissing any bystanders;

       b.   Demanding or threatening sexual contact;

c.   Cornering, chasing, blocking, or otherwise using his heft to cause Plaintiffs and the Class to fear that Weinstein had the ability to carry out his physical threats; and

d.   Threatening harm to the careers and reputations of Plaintiffs and the Class members if they did not participate in such conduct.

293.   Weinstein's actions did, in fact, cause Plaintiffs and the Class members to fear imminent harmful or offensive contact by Weinstein.

294.   Weinstein's conduct was committed within the scope of his employment at TWC. A causal nexus existed between (i) Weinstein's grooming of women in the entertainment industry to work with TWC and (ii) his abuse of his power to coerce and batter those women. Each act of battery of a Class member lured with the prospect of being cast in a TWC production or to meet or work with TWC and Weinstein was foreseeable given, *inter alia*, the use of TWC employees to lure the victims and the commission of the acts on TWC property or at locations paid for by TWC.

295.   Weinstein's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of TWC's business. Assaults in the context of the "casting couch" are exactly why Class members and other female members of the entertainment industry would expect production companies to take extra precautions to ensure that they are protected from abuse by a powerful executive.

296.   Holding TWC Board Members liable advances the policy goals of *respondeat superior*, including the prevention of future injuries and the assurance of compensation to victims, given that Plaintiff and the Class members do not have separate remedies under Title VII because they were not employees of TWC.

## COUNT IX

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## (CAITLIN DULANY AND LARISSA GOMES VERSUS WEINSTEIN AND MIRAMAX)

297.    Plaintiffs Caitlin Dulany and Larissa Gomes restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein, and bring this Count IX on behalf of the Miramax Subclass.

298.    Weinstein's extreme and outrageous conduct intentionally or recklessly caused severe emotional distress to Plaintiffs and the Class members.

299.    Weinstein's outrageous conduct was not the type of ordinary rude or obnoxious behavior that women should be expected to weather. Rather, Weinstein's conduct exceeded all possible bounds of decency.

300.    Weinstein acted with intent or recklessness, knowing that his female victims were likely to endure emotional distress.  Indeed, he used this distress to subdue and threaten the women and prevent them from complaining or suing based on his actions.  He did so with deliberate disregard as to the high possibility that severe emotional distress would occur.

301.    Weinstein's conduct caused suffering for Plaintiffs and the Class members at levels that no reasonable person should have to endure.

302.    Weinstein's conduct was committed within the scope of his employment at Miramax. A causal nexus existed between (i) Weinstein's grooming of women in the entertainment industry to work with Miramax and (ii) his abuse of his power to coerce and batter those women.  Each act of battery of a Class member lured with the prospect of being cast in a Miramax production or to meet or work with Miramax and Weinstein was foreseeable given, *inter alia*, the use of Miramax employees to lure the victims and the commission of the acts on Miramax property or at locations paid for by Miramax.

- 81 -

303.    Weinstein's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of Miramax's business. Assaults in the context of the "casting couch" are exactly why Class members and other female members of the entertainment industry would expect production companies to take extra precautions to ensure that they are protected from abuse by a powerful executive.

304.    Holding Miramax liable advances the policy goals of *respondeat superior*, including the prevention of future injuries and assurance of compensation to victims, given that Plaintiff and the Class members do not have separate remedies under Title VII because they were not employees of Miramax.

## COUNT X

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (MELISSA THOMPSON VERSUS WEINSTEIN AND TWC BOARD MEMBERS)

305.    Plaintiff Melissa Thompson restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein, and brings this Count X on behalf of the TWC Subclass.

306.    Weinstein's extreme and outrageous conduct intentionally or recklessly caused severe emotional distress to Plaintiff and the Class members.

307.    Weinstein's outrageous conduct was not the type of ordinary rude or obnoxious behavior that women should be expected to weather. Rather, Weinstein's conduct exceeded all possible bounds of decency.

308.    Weinstein acted with intent or recklessness, knowing that his female victims were likely to endure emotional distress.  Indeed, he used this distress to subdue and threaten the women and prevent them from complaining or suing based on his actions.  He did so with deliberate disregard as to the high possibility that severe emotional distress would occur.

309.    Weinstein's conduct caused suffering for Plaintiffs and the Class members at levels that no reasonable person should have to endure.

310.    Weinstein's conduct was committed within the scope of his employment at TWC. A causal nexus existed between (i) Weinstein's grooming of women in the entertainment industry to work with TWC and (ii) his abuse of his power to coerce and batter those women. Each act of battery of a Class member lured with the prospect of being cast in a TWC production or to meet or work with TWC and Weinstein was foreseeable given, *inter alia*, the use of TWC employees to lure the victims and the commission of the acts on TWC property or at locations paid for by TWC.

311.    Weinstein's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of TWC's business. Assaults in the context of the "casting couch" are exactly why Class members and other female members of the entertainment industry would expect production companies to take extra precautions to ensure that they are protected from abuse by a powerful executive.

312.    Holding TWC Board Members liable advances the policy goals of *respondeat superior*, including the prevention of future injuries and assurance of compensation to victims, given that Plaintiffs and the Class members do not have separate remedies under Title VII because they were not employees of TWC.

## COUNT XI

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (CAITLIN DULANY AND LARISSA GOMES VERSUS WEINSTEIN AND MIRAMAX)

313.    Plaintiffs Caitlin Dulany and Larissa Gomes restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein, and bring this Count XI on behalf of the Miramax Subclass.

314. Weinstein's conduct negligently caused emotional distress to Plaintiffs and the Class members.

315. Weinstein could reasonably foresee that his action would have caused emotional distress to Plaintiffs and the Class members.

316. Plaintiffs and the Class members were in a specific zone of danger meeting with Weinstein and at risk of physical harm, causing their fear.

317. Plaintiffs and the Class members, immediately or shortly after meeting with Weinstein, suffered distress and emotional harm.

318. Weinstein's conduct was committed within the scope of his employment at Miramax. A causal nexus existed between (i) Weinstein's grooming of women in the entertainment industry to work with Miramax and (ii) his abuse of his power to coerce and batter those women.  Each act of battery of a Class member lured with the prospect of being cast in a Miramax production or to meet or work with Miramax and Weinstein was foreseeable given, *inter alia*, the use of Miramax employees to lure the victims and the commission of the acts on Miramax property or at locations paid for by Miramax.

319. Weinstein's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of Miramax's business. Assaults in the context of the "casting couch" are exactly why Class members and other female members of the entertainment industry would expect production companies to take extra precautions to ensure that they are protected from abuse by a powerful executive.

320. Holding Miramax liable advances the policy goals of *respondeat superior*, including the prevention of future injuries and assurance of compensation to victims, given that

Plaintiffs and the Class members do not have separate remedies under Title VII because they were not employees of Miramax.

## COUNT XII

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (MELISSA THOMPSON VERSUS WEINSTEIN AND TWC BOARD MEMBERS)

321.    Plaintiff Melissa Thompson restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein, and brings this Count XII on behalf of the TWC Subclass.

322.    Weinstein's conduct negligently caused emotional distress to Plaintiffs and the Class members.

323.    Weinstein could reasonably foresee that his action would have caused emotional distress to Plaintiffs and the Class members.

324.    Plaintiffs and the Class members were in a specific zone of danger meeting with Weinstein and at risk of physical harm, causing their fear.

325.    Plaintiffs and the Class members, immediately or shortly after meeting with Weinstein, suffered distress and emotional harm.

326.    Weinstein's conduct was committed within the scope of his employment at TWC. A causal nexus existed between (i) Weinstein's grooming of women in the entertainment industry to work with TWC and (ii) his abuse of his power to coerce and batter those women. Each act of battery of a Class member lured with the prospect of being cast in a TWC production or to meet or work with TWC and Weinstein was foreseeable given, *inter alia*, the use of TWC employees to lure the victims and the commission of the acts on TWC property or at locations paid for by TWC.

327.     Weinstein's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of TWC's business. Assaults in the context of the "casting couch" are exactly why Class members and other female members of the entertainment industry would expect production companies to take extra precautions to ensure that they are protected from abuse by a powerful executive.

328.     Holding TWC Board Members liable advances the policy goals of *respondeat superior*, including the prevention of future injuries and assurance of compensation to victims, given that Plaintiff and the Class members do not have separate remedies under Title VII because they were not employees of TWC.

**COUNT XIII**

**RATIFICATION**
**(CAITLIN DULANY AND LARISSA GOMES VERSUS MIRAMAX AND ROBERT WEINSTEIN)**

329.     Plaintiffs Caitlin Dulany and Larissa Gomes restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein, and bring this Count XIII on behalf of the Miramax Subclass.

330.     Weinstein was an agent, director, and employee of Miramax prior to September 30, 2005.

331.     At the time of the acts prior to September 30, 2005, there was an actual or assumed agency relationship between Weinstein and Miramax, as well as between Weinstein and Robert Weinstein.

332.     All acts or omissions alleged for the period before September 30, 2005, were ratified by Miramax and Robert Weinstein. Miramax and Robert Weinstein had investigated or knew of the acts and omissions of Weinstein, and Miramax's employees, managers, supervisors, executives, and directors were informed that Weinstein was sexually abusing female actors and

members of the entertainment industry and refused to take any action to stop him. Moreover, Miramax's managers, supervisors, executives, and directors hid this information so that Weinstein could continue to work for Miramax.

333.    Despite knowledge of Weinstein's sexual misconduct, no disciplinary action was taken and he was allowed to be alone with women while on Miramax business.

334.    Miramax and Robert Weinstein are thus responsible for Weinstein's acts of assault, battery, and intentional or negligent infliction of emotional distress.

## COUNT XIV

### RATIFICATION
### (MELISSA THOMPSON
### VERSUS TWC'S BOARD OF DIRECTORS)

335.    Plaintiff Melissa Thompson restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein, and bring this Count XIV on behalf of the TWC Subclass.

336.    Weinstein was an agent, director, and employee of TWC until October 2017.

337.    At the time of the acts alleged herein, there was an actual or assumed agency relationship between Weinstein and TWC, as well as between Weinstein and TWC's Board of Directors.

338.    All acts or omissions alleged herein after September 30, 2005, were ratified by TWC's Board of Directors. TWC's Board of Directors had investigated or knew of the acts and omissions of Weinstein, and TWC's employees, managers, supervisors, executives, and directors were informed that Weinstein was sexually abusing female actors and members of the entertainment industry and refused to take any action to stop him. Moreover, TWC's managers, supervisors, executives, and directors hid this information so that Weinstein could continue to work for TWC.

339.     Despite knowledge of Weinstein's sexual misconduct, no disciplinary action was taken and he was allowed to be alone with women while on TWC business.

340.     TWC's Board of Directors are thus responsible for Weinstein's acts of assault, battery, and intentional or negligent infliction of emotional distress.


**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all Class members, pray that this Court:

1.     Certify the Class pursuant to Fed. R. Civ. P. 23(c)(4) for liability and reserve damages and pursuant to Fed. R. Civ. P. 23(b)(2) for injunctive relief, name Plaintiffs as representative of the Class and the respective Subclasses, and appoint their lawyers as Class Counsel;

2.     Enter judgment against Harvey Weinstein on liability on Counts I-XII in favor of Plaintiff and the Classes;

3.     Enter judgment against Robert Weinstein on liability on Counts I-XIV in favor of Plaintiffs and the Classes;

3.     Enter judgment against Miramax on liability on Counts I, II, III, V, VII, IX, XI, and XIII in favor of Plaintiffs and the Classes;

4.     Enter judgment against The Walt Disney Company and Disney Enterprises, Inc. on Count III in favor of Plaintiffs and the Miramax Class;

5.     Enter judgment against Dirk Ziff, Tim Sarnoff, Marc Lasry, Tarak Ben Ammar, Lance Maerov, Richard Koenigsberg, Paul Tudor Jones, Jeff Sackman, James Dolan on liability on Counts I, II, IV, VI, VIII, X, XII and XIV in favor of Plaintiffs and the Classes;

- 88 -

6.    In individual damage proceedings and prove-ups, award Plaintiffs and the Class

members damages for pain and suffering, and compensatory and punitive damages;

7.    Award Plaintiffs' counsel attorneys' fees and costs, and grant Plaintiffs service

awards as class representatives;

8.    Grant such other and further relief as this Court deems appropriate.

DATED: June 1, 2018                HAGENS BERMAN SOBOL SHAPIRO LLP

By /s/ Jason Zweig
Jason Zweig
555 Fifth Avenue
Suite 1700
New York, NY 10017
*jasonz@hbsslaw.com*

Steve W. Berman
Shelby Smith
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
*steve@hbsslaw.com*
*shelbys@hbsslaw.com*

Elizabeth A. Fegan
Emily Brown
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Dr., Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
Facsimile: (708) 628-4950
*beth@hbsslaw.com*
*emilyb@hbsslaw.com*


M. Cris Armenta
Credence E. Sol
THE ARMENTA LAW FIRM, APC
1230 Rosecrans Ave, Suite 300
Manhattan Beach, CA 90266
Telephone:  (310) 826-2826 Ext. 108
*cris@crisarmenta.com*

*credence.sol@orange.fr*